Johnnie B. TAYLOR, et al.,
Plaintiffs–Appellants,

v.

MONSANTO CO., Defendant–Appellee.

No. 97–2469.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1997.

Decided Aug. 5, 1998.

David S. McCrea (argued), McCrea & McCrea, Bloomington, IN, for Plaintiffs–Appellants.

Michael R. Fruehwald and Michael Rosiello (argued), Barnes & Thornburg, Indianapolis, IN, for Defendant–Appellee.

Before EASTERBROOK, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

At least to the outside observer, some cases appear to be unevenly balanced clashes between a titan of industry and a hapless individual. This case is not one of them. Instead, the central question before us is whether the Monsanto Company, one of the country's largest manufacturers of chemicals, lulled the Westinghouse Electric Company, a major user of those chemicals, into the erroneous view that polychlorinated biphenyls (PCBs) were safe for human health. The question arises in a case brought by several employees of Westinghouse, who are now trying to recover for various health problems from Monsanto. The district court concluded that Monsanto breached no duty to Westinghouse's employees, because Westinghouse itself was a knowledgeable and sophisticated bulk purchaser of Monsanto's products. The court further concluded that Monsanto reasonably relied on Westinghouse itself to warn its employees of the dangers associated with PCBs, and that Monsanto's warnings to Westinghouse were adequate. We agree, and affirm the judgment of the district court.

## I

From their development in the late 1920s until their severe restriction in 1977 by the federal government, see 15 U.S.C. § 2605(e)(2)(A), PCBs were produced in the United States exclusively by Monsanto under the trade names "Aroclor" and "Therminol." During much of this time, Monsanto sold substantial quantities of PCB-laden fluids to Westinghouse, which used them either as a dielectric in power transformers it manufactured at its plant in Bloomington, Indiana, or as a heat transfer fluid in the "Vapotherm" transformer repair machine at its Muncie, Indiana plant. The deleterious human health and environmental effects of PCBs have been well-documented and require little additional explanation here. PCB exposure has been linked to a variety of ailments from relatively minor chloracne to acute toxicity. (It bears noting that this case does not involve any claims concerning the more notorious polychlorinated dibenzo furans or dibenzo-p-dioxins, which contaminated some PCBs.)

In June 1991, nine former Westinghouse employees (and seven of their wives) sued Westinghouse and Monsanto in federal court under the diversity jurisdiction, alleging a variety of state law claims related to PCB exposure. Their amended complaint alleged battery, fraud in the inducement, fraudulent misrepresentation, restitution, conspiracy, and tortious failure-to-warn. The claims against Westinghouse dropped out of the case after the Indiana Supreme Court, responding to a question certified by the U.S. District Court for the Southern District of Indiana, answered it adversely to the plaintiffs. See *Baker v. Westinghouse Elec. Corp.*, 637 N.E.2d 1271 (Ind.1994). Jurisdiction is proper in the federal court, because all the plaintiffs are Indiana citizens, and Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. After voluntarily withdrawing a few of their theories, the plaintiffs continued their case against Monsanto. In August 1996, the plaintiffs John Taylor, Richard Sluder, and his wife Deittra Sluder filed for partial summary judgment on several of their claims against Monsanto, which in turn responded with a cross-motion for the same on the plaintiffs' remaining claims. The district court denied the plaintiffs' motion, granted Monsanto's, and eventually entered a Rule 54(b) final judgment. The plaintiffs have

appealed only their tortious failure-to-warn claim.

## II

Under Indiana law, there is no doctrinal distinction between the negligent and strict liability failure-to-warn actions. See *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 163 n. 11 (Ind.Ct.App.1997). In both cases, a manufacturer has a duty to warn those persons it should reasonably foresee would be likely to use its product or who are likely to come into contact with a latent danger inherent in the product's use. See *id.* at 162. Although this duty to warn the ultimate consumer is sometimes described as "non-delegable," see, *e.g., id.* at 163, the Indiana Appellate Court has clearly recognized the "sophisticated intermediary" defense, which holds that there is no duty to warn an ultimate user when the product is sold to a "knowledgeable or sophisticated intermediary" whom the manufacturer has adequately warned. *Id.* at 163 · n. 10. *Cf. Downs v. Panhandle Eastern Pipeline Co.*, 694 N.E.2d 1198, 1208–09 (Ind.Ct.App.1998) (variant of doctrine for "bulk suppliers"). Delegation of the duty to warn makes particular sense where the manufacturer cannot control how the intermediary will use the product, *cf. Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 286 (Ind.1983), and where the form of the product does not easily lend itself to direct labeling. *Cf. York v. Union Carbide Corp.*, 586 N.E.2d 861, 869 (Ind.Ct.App. 1992). In order for the exception to apply, however, the intermediary must have knowledge or sophistication equal to that of the manufacturer, and the manufacturer must be able to rely reasonably on the intermediary to warn the ultimate consumer. *Natural Gas Odorizing*, 685 N.E.2d at 164.

In the present case, the district court granted Monsanto's cross-motion for summary judgment on the plaintiffs' failure-to-warn claim, finding that the only reasonable conclusion from the evidence presented was that Westinghouse was a sophisticated intermediary to whom Monsanto had given adequate warnings about PCBs. On appeal, the plaintiffs challenge the district court's conclu-

sions about Westinghouse's level of sophistication and the adequacy of Monsanto's warnings, both of which are ordinarily questions of fact. *Cf. Panhandle Eastern Pipeline Co.*, 694 N.E.2d 1198, 1209–10 (sophistication of third-party); *Natural Gas Odorizing*, 685 N.E.2d at 164 (adequacy of warning given to third-party). Other than these purely factual points, the plaintiffs' appeal raises no questions of law. Thus, on this de novo review from summary judgment, we may affirm if we find that there are no genuine issues of material fact regarding the district court's conclusions. *Life Ins. Co. of North America v. Von Valtier*, 116 F.3d 279, 283 (7th Cir. 1997).

### A. Was Westinghouse a "Sophisticated Intermediary"?

The record at summary judgment is replete with uncontroverted evidence that Westinghouse was highly sophisticated about PCBs. Westinghouse gave Monsanto individualized specifications for the dielectric fluids to be produced, and Monsanto delivered the PCBs in large quantities by railroad car, tank truck, and 55-gallon drum. Westinghouse had used PCBs for over 40 years and had developed vast in-house medical, engineering, and environmental expertise about the chemicals. For example, by as early as 1953 Westinghouse had prepared its own Material Safety Data Sheets and Safe Practice Data Sheets for PCB-laden fluids. In fact, Westinghouse's in-house knowledge about PCBs was so sophisticated that the company participated in federal and industry task forces and working committees on PCBs. Perhaps recognizing the futility of trying to portray Westinghouse as a babe in the woods on general matters related to PCBs, the plaintiffs argue that while Westinghouse may have been expert about the environmental consequences of PCBs, the company was unsophisticated and ignorant about the human health and employee safety hazards relating to those toxics.

As a threshold matter, we question the plaintiffs' attempt to fine-tune the "sophisticated intermediary" doctrine to make it require Westinghouse to have specific expertise on human health and employee safety

issues related to PCBs. While there is often no easy way to select the particular "level of abstraction" that governs an analysis, *cf. Nash v. CBS, Inc.*, 899 F.2d 1537, 1540–41 (7th Cir.1990) (copyright context), Indiana courts have in the past taken a broad, multifactor view of the level of sophistication required under the "sophisticated intermediary" doctrine. See generally *Panhandle Eastern Pipeline*, 694 N.E.2d 1198, 1208–09; *Natural Gas Odorizing*, 685 N.E.2d at 164; York, 586 N.E.2d at 871–72. In any event, the plaintiffs' own Second Amended Complaint repeatedly alleges that Westinghouse knew of the medical risks from PCBs. Judicial admissions are concessions in the pleadings that bind the party making them and that withdraw a fact from contention. See *Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir.1995). Finally, the plaintiffs have failed to point to a shred of evidence in the record suggesting that Westinghouse was ignorant or unsophisticated about the health effects of PCBs. Instead, they have relied on conclusory and self-serving allegations unsupported by the record, which do not preclude summary judgment. *Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir.1997). For these reasons, the district court properly invoked the "sophisticated intermediary" doctrine.

### B. Did Monsanto Fail to Warn Westinghouse?

█ The plaintiffs argue that, even assuming Westinghouse was a sophisticated intermediary to whom Monsanto could reasonably delegate the task of warning ultimate consumers about PCBs, Monsanto nevertheless failed adequately to warn Westinghouse about PCB dangers. On its face, this argument seems to ignore the reams of uncontroverted evidence in the record that Monsanto consistently warned Westinghouse about PCB dangers. As early as 1959 Monsanto warned that "repeated skin contact with any of the Aroclors ... could lead to chloracne ... which could be an indication of more serious systemic injury." Monsanto also sent Westinghouse animal toxicity studies on PCBs and Material Safety Data Sheets with specific warnings about the risks of overexposure. Once again, faced with voluminous evidence that Monsanto gave Westinghouse all manner of warnings, the plaintiffs argue that these advisories were merely "warnings with a wink"—meaning, warnings that were neutralized by misrepresentations Monsanto also made about PCB safety. Although the plaintiffs have made some scattershot allusions to various alleged misrepresentations, their argument focuses principally on two communications: (1) a 1974 publication by the American National Standards Institute (ANSI) titled "Guidelines for Handling and Disposal of Capacitor- and Transformer-Grade Askarels Containing [PCBs]"; and (2) a 1975 letter from Monsanto to the Westinghouse Personnel Department describing the health effects of PCBs. Although allegations of "warnings with a wink" seem more relevant to a fraud theory than a claim for failure-to-warn, in the end this subtlety makes no difference since the plaintiffs' allegation that Monsanto misrepresented the risks of PCBs is mere speculation, which of course cannot create a genuine issue of material fact for trial. See *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995).

The plaintiffs appear to place their heaviest reliance on one sentence in the ANSI document, which states that "medical records over a nearly 40–year period show that the only adverse health effects experienced by U.S. workers exposed to [PCBs] ... during the manufacture of these liquids ... have been limited to occasional cases of nonchronic chloracne or other temporary skin lesions or irritations." This sentence, they argue, implies that Monsanto conducted a study of the medical records of workers who made PCBs. In fact, no such study ever occurred. Monsanto's implication to the contrary was therefore false, and if it was making false statements to Westinghouse, plaintiffs believe that there is a material dispute over whether Monsanto's warnings to Westinghouse were adequate. We disagree. Even assuming that a reasonable jury could interpret the ANSI document as falsely implying what the plaintiffs say it does, the plaintiffs' argument is still premised on mere speculation. ANSI is not Monsanto, and the state-

ments of the former cannot be reasonably imputed to the latter. The committee included 10 other members, and the Foreword to the report clearly stated that "[c]ommittee approval of the standard does not imply that all committee members voted for its approval." Although William Papageorge, a Monsanto employee, chaired the ANSI committee and although Monsanto was the sole domestic manufacturer of PCBs, it simply pushes matters too far to impute the ANSI committee's statement to Monsanto. *Cf. Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397 (7th Cir.1997) (statement by non-decisionmaker about decisionmaker's motivation did not create direct inference that decisionmaker violated ADEA). No reasonable jury could find otherwise.

Similarly, the plaintiffs point to a March 1975 letter from Papageorge to Dan Albert in Westinghouse's Personnel Department. In that letter, Papageorge responded to seven questions about the health effects of PCBs that Albert had previously asked Monsanto. The plaintiffs urge the court to focus on Papageorge's statement that "no human harm" had resulted from proper PCB handling in over 40 years—a statement the plaintiffs claim was the "wink" from Monsanto assuring Westinghouse that PCBs were safe. This interpretation of the Papageorge letter, however, is misleadingly selective. In the four-page letter, Papageorge also warns Westinghouse at length of the risk of skin irritation, chloracne, injury to cellular tissue, "serious liver injury" (emphasis in original), and even death. Read as a whole, the letter plainly was not a "warning with a wink." Instead, it described PCBs as potentially dangerous substances that should—and could—be properly handled in a safe manner. It would be unreasonable as a matter of law for a jury to interpret the letter as the plaintiffs urge. *Cf. Parrillo v. Commercial Union Ins. Co.*, 85 F.3d 1245, 1250 n. 5 (7th Cir.1996) (declining to find that evidence taken "out of context" created a genuine issue of material fact for trial).

### III

Based on the evidence presented at summary judgment, a reasonable jury could only have concluded that Westinghouse was sophisticated about PCBs, that Monsanto warned Westinghouse about the dangers of PCBs with more than a "wink," and that Monsanto accordingly could defend itself under the "sophisticated intermediary" doctrine. The district court properly refused to speculate on other matters, such as whether Monsanto was "really" responsible for the ANSI statement. Having ruled against the employee-plaintiffs' claims, the district judge properly dismissed the derivative claims brought by the spouse-plaintiffs. For these reasons, the judgment of the district court under Rule 54(b) is AFFIRMED.