In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4239

Ronald Lesch,

Plaintiff-Appellant,

v.

Crown Cork & Seal Co.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 1715--Suzanne B. Conlon, Judge.

Argued May 15, 2001--Decided February 28, 2002


  Before Ripple, Manion, and Diane P. Wood,
Circuit Judges.

  Diane P. Wood, Circuit Judge.  At the age
of 61, Ronald Lesch's career as the
comptroller of Crown International
Management Systems (CIMS), a division of
Crown Cork & Seal Co. (Crown), came to an
abrupt end when Crown acquired a French
company and decided it no longer needed
CIMS to provide certain accounting
services it had previously used. Lesch
believed that age discrimination lay
behind the loss of his job, given that a
man 11 years his junior was selected to
head the new Corporate Technologies (CT)
accounting group, and given the fact that
the CT group took over some non-CIMS
accounting work Lesch had formerly
overseen. Following his forced early
retirement, Lesch filed a timely
complaint with the EEOC alleging that
Crown violated the Age Discrimination and
Employment Act (ADEA), 29 U.S.C. sec. 621
et seq., by dismissing him from his
position and replacing him with someone
younger. After receiving his right-to-sue
letter, Lesch filed a claim in federal
district court. The district court
granted summary judgment to Crown, which
we affirm.

I

  Lesch's termination was undoubtedly

painful; by the time he left, he had worked for CIMS for almost 40 years. As of 1997, when he was 61, he was the comptroller, or head accountant, for what was then Crown's division in charge of international operations. Early that year, Crown had decided to consolidate its accounting operations for both CIMS and CT under Lesch's supervision. On the recommendation of Judith White, one of CT's executive staff, Siegfried Genutis was brought in to take primary responsibility for CT's accounting work. Genutis had relatively little formal experience in accounting methods, but he had extensive expertise in computers and the software used to compile and generate reports from financial data. When Genutis joined the CIMS accounting group, Lesch assigned Douglas Pittman, a staff accountant, to train Genutis in the group's accounting methods. Before long, Genutis, while technically still under Lesch's supervision, was almost exclusively working directly with White on CT's accounting projects.

Around the same time, Crown acquired Carnaud Metal Box, a French company that specialized in many of the same overseas product development and management services that CIMS provided. Crown decided to eliminate the duplication by phasing out the CIMS division and terminating all of its employees. CT, in contrast, was not slated to lose any positions as a result of the acquisition. Instead, new arrangements had to be made for meeting CT's accounting needs.

White had the responsibility of establishing a new, stand-alone CT accounting group, drawing from the CIMS accounting staff. She wanted the head of the CT group to be a strong manager, but, just as importantly, she wanted someone with the necessary information technology expertise to help advance the computerization of accounting operations at Crown. Based upon these criteria, and the fact that she had found him to be a highly competent accountant who understood CT's accounting needs, White selected Genutis to head the CT group. White also selected three junior level accountants for the group, one of whom was Douglas Pittman. At the time, Genutis was 50 and Pittman was 53.

When the unwelcome word reached Lesch in

early 1997 that his CIMS comptroller position was slated for elimination, he approached Fred Leh in Crown's Human Resources Department about finding an alternative position. Lesch did not want to retire before he turned 65 and indicated to Leh his willingness to take even a demotion in order to remain with the company. At the time, Lesch was not aware of White's plans to use accountants from the CIMS group to meet CT's accounting needs. As part of Leh's search for alternative positions, however, Leh learned that White had chosen to retain Genutis rather than Lesch to lead the revamped CT group. It is unclear from the record whether Leh discussed with White the possibility of Lesch's taking one of the entry level accounting positions, but White later wrote Leh an e-mail note in which she explained that she had never considered Lesch for the entry level positions because of his status as a senior manager.

Despite his attempts, Leh was unable to find any alternative position for Lesch within Crown, and Lesch was forced into early retirement on September 30, 1998, the day the position of CIMS comptroller was officially eliminated. Lesch subsequently filed a charge with the EEOC alleging that he had been terminated from his position because of his age in violation of the ADEA. He further alleged that his position at Crown had not been eliminated and that Genutis, a substantially younger employee, had been promoted to fill it. Based on the EEOC's right-to-sue letter, Lesch filed the same "discriminatory termination" claim in the district court.

The theory of the case that Lesch initially presented to the EEOC and to the district court was that although CIMS had been phased out, the job of manager of CT's accounting projects (which Lesch had held) remained, and rather than retaining him to continue those duties, Crown fired him and promoted Genutis. By the time the case reached the summary judgment stage, however, Lesch had reframed his theory of the case into something that looked much more like a "failure to transfer" claim. He conceded that all positions in the CIMS accounting group had been eliminated in the reduction in force--including those relating to CT's accounting work--and alleged instead that Crown had

discriminated against him on the basis of age by failing to transfer him to a new CT group position. In support of this claim, he pointed to Genutis and Pittman as younger workers who were transferred despite their being less qualified than he was to fill the positions.

For purposes of its analysis, the district court proceeded as though Lesch were arguing separate claims, one fordiscriminatory termination and another for failure to transfer. The court granted summary judgment to Crown on Lesch's discriminatory termination claim. It dismissed his failure to transfer claim, principally because it was not encompassed within his EEOC charge, and alternatively on the merits.

II

When a case is dismissed at the summary judgment stage our review is de novo. Trahant v. Royal Indem. Co., 121 F.3d 1094, 1095 (7th Cir. 1997). We consider the evidentiary record in the light most favorable to the non-moving party, in this case Lesch, and draw all reasonable inferences in his favor. Summary judgment is only appropriate where the record discloses no dispute as to any material fact. Taylor v. Monsanto Co., 150 F.3d 806, 808 (7th Cir. 1998).

Before going any further, we need to clarify exactly what theory or theories Lesch has preserved at this stage of the case. As we said, over the course of this litigation, Lesch has advanced two distinct claims under the ADEA, one for discriminatory termination, another for discriminatory failure to transfer. The district court correctly observed that his EEOC charge mentioned only the discriminatory termination claim. Lesch is bound by the charges he filed with the EEOC. Ritter v. Hill 'N Dale Farm, Inc., 231 F.3d 1039, 1045 (7th Cir. 2000). This means, as the district court concluded, that the failure to transfer claim was not properly before the district court. As such, it is not properly before us either, even if we read the charges of discrimination liberally. Id.

Affirming this aspect of the district court's opinion would normally be of relatively little consequence, as long as the discriminatory termination claim

Lesch actually raised in his EEOC charge was still in the case. But there is an issue about this very point. Lesch's entire appellate argument has been framed in terms of a discriminatory failure to transfer him to the CT group--the claim he did not raise with the EEOC. He contends that the reasons Crown gives for choosing both Genutis and Pittman over him for the new CT group are pretextual. We must therefore decide whether Lesch has waived any potentially appealable issues he might have had on his discriminatory termination claim.

Although the question is close, we conclude that nothing Lesch has done prevents us from reaching the merits of this issue. Crown has itself waived any opportunity to rely on any omissions found in Lesch's brief. See, e.g., Soo Line R.R. Co. v. St. Louis Southwestern Ry., 125 F.3d 481, 483 n. 2 (7th Cir. 1997). Crown did not urge us to affirm the district court's judgment on the theory that the only claim Lesch preserved for appellate review was the flawed transfer one. Furthermore, on these facts there is not a very sharpdistinction between the two characterizations of what happened at Crown. On the one hand, Lesch's job title was eliminated, as was the CIMS accounting group that he directed. The directorship of the CT group position could thus be viewed as a new position into which Crown chose to transfer Genutis rather than Lesch. On the other hand, certain activities that Lesch had previously overseen-- specifically, CT's accounting projects--remained after the CIMS phase-out. In this sense, the CT group director might be viewed as a continuation of Lesch's job under a new name. The line between arguing that Genutis was promoted into Lesch's position and arguing that Genutis was hired over Lesch for a new position is thus a fine one. We will therefore address Lesch's arguments to the extent that they pertain to the discriminatory termination claim.

Lesch's claim that he, rather than Pittman, should have been given one of the junior accountant positions in the CT group is the one that is not properly before us. That claim cannot be construed as anything other than an argument that Crown discriminated in choosing whom to

transfer into the CT group. We note for the sake of completeness that even if we were to consider Lesch's claim with respect to the junior accounting position, the district court's decision appears to be correct. At 53, Pittman was presumptively not "substantially younger" than Lesch, and Lesch thus failed to identify someone similarly situated but substantially younger who was transferred to a junior accounting position. See Taylor v. Canteen Corp., 69 F.3d 773, 780 (7th Cir. 1995). Lesch also failed to present sufficient evidence that Crown's explanation for not considering him for the junior accounting position--that it was a position significantly junior to his own--was pretextual. We note in this context that it is legitimate for an employer to deem someone over-qualified, as well as under-qualified, for a position. See Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 679 (7th Cir. 1998).

Because there is no direct evidence of age discrimination in this case, Lesch has proceeded using indirect evidence and the burden-shifting approach first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, it was Lesch's burden to make out a prima facie case. To the extent he was pursuing a discriminatory termination theory, he was required to present enough evidence to create a triable issue of fact on each of the following elements: 1) he is a member of the class protected by the statute; 2) he reasonably performed to his employer's expectations; 3) he was terminated; and 4) the position remained open or he was replaced by someone substantially younger. See, e.g., Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000). Where, as here, an employee is terminated pursuant to a reduction in force, the fourth element can also be satisfied by showing that similarly situated, substantially younger employees were retained. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 693 (7th Cir. 2000). Under the normal McDonnell Douglas analysis, once Lesch substantiated his prima facie case, the burden would shift to Crown to articulate a legitimate non-discriminatory reason for terminating or failing to transfer Lesch. If Crown was able to do so, then Lesch had to muster sufficient evidence to convince a rational jury that Crown's

justifications were pretextual. Beatty v. Wood, 204 F.3d 713, 717 (7th Cir. 2000).

It is not always necessary to march through this entire process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof. Crown articulated several legitimate business justifications for Lesch's termination. To meet his burden of showing pretext, Lesch had to present sufficient evidence that the proffered reasons for the termination had no basis in fact, that they did not actually motivate Crown's decision, or that they were insufficient to motivate the decision. Collier v. Budd Co., 66 F.3d 886, 892 (7th Cir. 1995). He has not done so.

Crown's principal justification for its decision to terminate Lesch was that the CIMS comptroller position had been eliminated as part of the phasing out of CIMS. Lesch contends that this justification was pretextual, because, he claims, the e-mail from White to Leh shows that the position was not really eliminated. He wonders why else White would be explaining to Leh her choice to make Genutis and not Lesch the head of the CT group. But the e-mail does not indicate that the CIMS comptroller position was merely being relabeled or continued in some respect. It is consistent instead with Crown's assertion that it was eliminating the CIMS comptroller position as part of a reorganization and that Crown was creating a new entity with new accounting positions to take over CT's accounting work. The fact that the head of the CT group would have some of Lesch's old job responsibilities is not enough to create a genuine issue of fact on the bona fides of Crown's motivations.

Lesch also suggests that evidence of pretext can be found by looking at White's justifications for choosing Genutis over him, but here, too, he does not present enough to go forward. When Crown decided that CIMS was no longer necessary, it was White's responsibility to determine who from the disbanded CIMS group would head up the new CT group. In an e-mail to Leh, White explained her decision to appoint Genutis rather than Lesch to run the CT group:

[Genutis] had been heading up the accounting for Corporate Technologies ever since he joined the Alsip accounting group for the purpose. He had done a fine job for me and understood better than anyone else the requirements and was the obvious candidate to lead the team.

She also explained that she perceived Lesch's job for CIMS as "far more a case of getting the books right than participating in management decisions which was the role I expected [Genutis] to play," and that she believed that with the exception of certain technical issues, the two men were "interchangeable" in terms of accounting skills. Finally, she observed that "the CT work required more & more use of PC's and this was a skill that [Lesch] did not pick up but that [Genutis] introduced to the department, training both the new people and the 3 original staff."

   These are all legitimate business reasons for terminating Lesch and assigning his remaining duties to Genutis. Moreover, while Lesch has attacked some of the reasons on appeal, he has said nothing about others. This alone dooms his effort to establish pretext. Where an employer offers multiple independently sufficient justifications for an adverse employment action, the plaintiff-employee must cast doubt on each of them. See Walker v. Glickman, 241 F.3d 884, 890 (7th Cir. 2001). Here, Lesch has no evidence to suggest that White did not or could not believe that Genutis was the "obvious" candidate to fill the position because he was most familiar with CT's accounting projects, had been doing a good job for her, and was sufficiently competent as an accountant to lead the group. Nor has Lesch identified evidence showing that Genutis was not, in fact, more familiar with CT's accounting needs than Lesch, or that Genutis was not doing a good job for White. And there is certainly no evidence that White did not believe these things to be true. There is evidence in the record to indicate that White might have been mistaken about whether Lesch andGenutis were largely "interchangeable" in terms of their accounting skills, given that Genutis was quite new to the field, but Lesch has not offered evidence to suggest that, based on her work with Genutis, White could not have had this

perception. "On the issue of pretext our only concern is the honesty of the employer's explanation," O'Connor v. DePaul Univ., 123 F.3d 665, 671 (7th Cir. 1997), and Lesch has not cast doubt on the honesty of White's belief.

Lesch specifically challenges only two of White's stated justifications for choosing Genutis: (1) his superior ability as a manager, and (2) his superior knowledge of computers. With respect to the first, Lesch offered affidavit testimony that he was, in fact, a skilled manager and that he had originally limited Genutis's direct contact with White out of concern about Genutis's ability to work with other managers. Lesch's affidavit cannot, however, tell us anything about whether White genuinely believed that Lesch's CIMS position was less managerial and more technocratic, or that Genutis would be a better participant in managerial decision-making. See, e.g., Ost v. West Suburban Travelers Limousine, Inc., 88 F.3d 435, 441 (7th Cir. 1996).

Lesch's attempt to cast doubt on White's asserted preference for someone with superior computer skills is similarly unavailing. Accounting is a profession (like many others) that has become increasingly computerized in recent years. The uncontroverted evidence in this record establishes that CT was moving toward a more computer-reliant system of accounting. There is also no question that Genutis' understanding of computers and dexterity with accounting software was far superior to Lesch's; Genutis came to CIMS from a computing job and, as White mentioned in her e-mail to Leh, it was Genutis who trained Lesch's staff in the use of computers and accounting software. On appeal, Lesch goes to great lengths to demonstrate that he was not completely computer-illiterate--he could use a keyboard, he could open and save Excel files, and he could input data into spreadsheets. All this may be true, but it is beside the point. There is much more to computerizing a company's accounting activities than knowing how to open an Excel file, and Genutis was known to have far more of the requisite skills. Much more so than Lesch, he was well versed in information technology and how it could be used to make accounting operations more efficient. White was entitled to

rely on this skill difference in choosing between Lesch and Genutis, and there is no evidence that her claim to have done so was a lie.

Lesch has thus failed to meet his burden of creating a triable issue of fact on the critical question of pretext. This failure in turn means that he did not have enough evidence to survive summary judgment on his discriminatory termination claim and to proceed to a full trial. This problem, coupled with the fact that his failure to transfer claim is not cognizable, leads us to Affirm the district court's grant of summary judgment to Crown.