# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-2274

FIRST NATIONAL BANK AND TRUST
CORPORATION, as Special Administrator
for the Estate of Lawrence W. Inlow,

*Plaintiff-Appellant,*

*v.*

AMERICAN EUROCOPTER CORPORATION
and EUROCOPTER, S.A.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 99 C 830—**David F. Hamilton**, *Judge.*

———————

ARGUED APRIL 14, 2004—DECIDED AUGUST 9, 2004

———————

Before BAUER, COFFEY, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Tragically, on May 21, 1997,
Lawrence Inlow was struck in the head by a helicopter rotor
blade as he disembarked from the aircraft owned by his
employer, Conseco, Inc. He died instantly. His estate, rep-
resented by First National Bank and Trust Corporation,
claimed that the helicopter was a defective product under
Indiana law because its manufacturer, Eurocopter, S.A.,

had negligently failed to warn Inlow or Conseco of the relevant danger. Because we agree with the district court that Indiana's sophisticated intermediary doctrine compels a grant of summary judgment to Eurocopter, we affirm.

## I.  History

Inlow served as general counsel for Conseco. The corporation is based in Carmel, Indiana, and owns numerous insurance and financial services companies. Although Inlow worked out of Conseco's Carmel headquarters, his duties took him around the country. On the morning of May 21, 1997, he and another attorney, Michael Colliflower, had a planned business trip. They intended to fly out of nearby Indianapolis International Airport to North Dakota via one of Conseco's private jets. Inlow and Colliflower left the company's headquarters aboard the helicopter. Upon arrival at the airport, Inlow was killed by the rotor blade as he made his way from the helicopter toward the private jet.

## A.  The Dauphin Helicopter

The helicopter involved in this case was a Dauphin AS-365-N2. It was manufactured by Eurocopter, a French corporation, and marketed in the U.S. by its subsidiary, American Eurocopter Corp. (collectively "Eurocopter"). Conseco purchased the Dauphin helicopter in 1992.

To better understand the specific circumstances of this accident, it is necessary to know a few basic facts about helicopters and, in particular, the Dauphin. As the district court performed this task concisely and without dispute by the parties, we will quote the helpful discussion:

> The lift that allows a helicopter to stay in the air is generated by the high-speed flow of air over the main rotor blades, which have a cross-section of an airfoil,

like the wings of a fixed-wing aircraft. For the Dauphin helicopter involved in the Inlow accident, the four main rotor blades have an overall diameter of 38 feet, 2 inches. Thus, at a typical flying speed of 350 [revolutions per minute (r.p.m.s)], the blade tips travel about 700 feet per second, or about 477 miles per hour. The rotor blades are made of a strong, lightweight carbon fiber material. They can and do bend up and down as they rotate.

When a helicopter runs its rotor blades at normal flight speeds, the blades are subject to centrifugal and lifting forces that raise the plane of the disk in which the blades rotate. When the Dauphin helicopter involved in this accident is parked and its blades are not moving, the blades droop to about 8 feet, 2 inches above level ground in front of the helicopter. (The blades are closest to the ground in front of the nose). The cyclic control on a helicopter controls the angle of the plane in which the rotor blades rotate. When the blades are under power and the cyclic control is in the neutral position, the blades may rise as high as 9 feet, 4 inches above level ground in front of the helicopter.

Dist. Ct. Op. at 8-9 (citations omitted).

The height of the rotor blades at rest (8'2" at the lowest point, which is directly in front of the helicopter) and during flight speed (up to 9'4") are marketed to Eurocopter's customers—business executives, medical personnel, law enforcement, and offshore oil platform operators—as a safety feature and a convenience.

However, there are two ways in which the safety of the Dauphin's high-set rotor is counteracted. First is the cyclic control factor, where the pilot tilts the rotor in order to move the helicopter in the direction of the tilt. As noted in the excerpt from the district court, "[w]hen the blades are under power and *the cyclic control is in the neutral position*,

the blades may rise as high as 9 feet, 4 inches above level ground in front of the helicopter." But, as testing done by Eurocopter in 1984 demonstrates, the height of the rotating blades at full power can decrease dramatically when the cyclic control is engaged. With normal use of the cyclic control at 5.2 degrees forward, the rotor blade clearance is 7 feet, 8 inches. But when the cyclic control is pushed beyond the normal operating limit to its absolute maximum forward position of 13 degrees, the rotor blade can reach as low as 5 feet, 2 inches. The record contains information about an accident in which an offshore oil worker was fatally struck in the head by a Dauphin blade as he approached the helicopter from the front. At the time, the helicopter was operating under full rotor r.p.m.s and the cyclic control was pushed forward.[1]

The second safety concern is known as "blade flap." Information about this dangerous phenomenon is set forth and widely available in Federal Aviation Administration documents, federal regulations adopted in Indiana, helicopter industry publications, pilot safety manuals, and pilot training books. Simply stated, "blade flap" occurs because the rotor blades are made of a non-rigid, lightweight carbon fiber material; the blades, therefore, flex up and down. The downward flex occurs at lower r.p.m.s. The main rotor blades pose the greatest danger at ground level when they are decelerating with the engines off. Under those circumstances, the lifting and centrifugal forces on the rotor blades are diminishing, and the rotor blades are subject to gusts of wind that may push the blades lower.

---

[1] This safety factor is largely irrelevant to Inlow's accident because Conseco's pilot had the cyclic control in the neutral position as Inlow departed. Any perceived lack of adequate warnings about the effects of cyclic control manipulation on blade height could have had no causal effect on this accident.

Thus, despite the high-set rotor, evidence favorable to the Inlow Estate establishes that, under two circumstances, the Dauphin rotor blades pose grave danger to anyone within the circular path of the blades. And as the Inlow accident and the offshore oil worker accident demonstrate, there is an actual danger (at least in front of the nose of the Dauphin) of death from either use of the cyclic control or deceleration-enhanced blade flap.

But within the Eurocopter organization, there was a difference of opinion as to whether it is safe under any circumstances to disembark from the Dauphin while the rotor blades are decelerating. The head of the preliminary design department and the engineer in charge of testing the Dauphin testified that it is a basic "rule of the art" that passengers should never be under the rotor disk during deceleration or acceleration phases. The engineer noted that if circumstances dictated that the rotors must continue turning (such as a medical evacuation or mountain rescue), the rotors should be under full power. The Eurocopter safety manager agrees that it is "standard procedure" to not load or unload while the blades are decelerating, although he did not think it was a practice expressly prohibited by Eurocopter. And finally, Eurocopter's former chief pilot agreed that unloading passengers while the blades are decelerating is the least desirable way to disembark, but he also said that he was never instructed to not do so and that he had probably unloaded some passengers while the blades were decelerating on demonstration flights in the past.

## B. Conseco's Policies and Practices

Eurocopter marketed the Dauphin as particularly desirable because of its high-set rotor. The salesman who closed the deal with Conseco executives, Neil Williams, told former Conseco President Stephen Hilbert that the Dauphin facilitated rapid egress. Williams even disembarked from a

Dauphin with Hilbert and Vice President of Conseco Flight Operations Dan Rice while the rotors were still spinning during a demonstration flight.

Notwithstanding the dangers of disembarking while the rotors are decelerating, Eurocopter did not directly warn anyone at Conseco of such risks. No warnings were posted in the helicopter; none were in the instruction manual. The flight manual simply states that "[w]hen practical, boarding and deplaning will be conducted with rotors stopped. When escorts are not available to assist in boarding and deplaning, passengers will be thoroughly briefed on appropriate procedures." The manual also makes clear that the pilot should remain at the controls and the flight crew or ground crew should accompany passengers to safety while disembarking.

After Conseco purchased the Dauphin, Rice implemented an imprudent disembarkation procedure that was concerned more with saving executive time and the level of engine noise than safety. Hilbert did not want to delay disembarking for the thirty-to-forty seconds it takes for the rotor blades to fully stop with the engines off, nor did he want to depart while the engines were running because the noise was extremely loud. As a result, Conseco developed as its deboarding policy that passengers would exit the Dauphin after the engines had been shut down but before the rotor blades had completely stopped. To implement this policy, Conseco's pilots required that passengers exit the helicopter directly abeam, i.e. ninety degrees off the aircraft. This requirement was designed to prevent passengers from stepping into the most dangerous sector of the blades' arc—in front of the helicopter.

The Conseco pilots, including Carl Deaton, who piloted the Dauphin the day of the accident, and Michael Sojka, the co-pilot the day of the accident, were well aware of the risks inherent in exiting a helicopter while the rotor blades were

decelerating. In fact, Deaton told Sojka some time before the accident that he would prefer not to disembark passengers while the rotor was slowing, and Sojka agreed. Deaton had even overruled the Conseco policy in the past when wind gusts were particularly strong. Several pilots and mechanics also complained to their Conseco superiors on occasion about the practice. Despite these suggestions by pilots and ground crew to stop the rotors completely before allowing passengers to deboard, Conseco management did not change the procedure. The Conseco pilots, although testifying after the accident that they were uncomfortable with the procedures because of their general inclination toward taking all conceivable precautions, confirmed that this discomfort did not stem from any warnings issued by Eurocopter. Instead, in the words of Deaton (the pilot during the relevant flight), his knowledge that "there was a potential for endangerment of passengers or personnel" came from "intuit[ion] or from military experience," not specific knowledge of how low the Dauphin blades actually could bend. Eurocopter's former chief pilot delivered the helicopter to Conseco and trained Conseco's pilots. He provided no warnings about blade flap.

## C. The Accident

The Dauphin arrived at Indianapolis International airport in windy conditions on the morning of May 21, 1997. Consistent with established Conseco procedures, the pilot shut down the helicopter after landing. The co-pilot exited the helicopter, "hugged" the nose of the Dauphin in walking to the other side, and opened the door for the six-foot tall Inlow and Colliflower. At the time of the accident, the pilot was at the controls (as he should have been), the co-pilot was attending to the passengers' luggage, and no one else, apparently, was present to escort the passengers away from the Dauphin.

Inlow was aware of the proper route for disembarkment—straight out of the aircraft at a ninety-degree angle (perpendicular) to the body of the helicopter. A frequent passenger for five years prior to the fatal accident, he had been warned in the past about walking in front of the Dauphin. Inlow was told more than once by pilots to follow the correct path. On one prior occasion, he had walked to the same spot where he was later killed. A Conseco pilot warned Inlow that it looked as if the blade came close to hitting him and that he needed to follow the exit procedure; Inlow acknowledged his understanding. On another occasion, Inlow was stopped before he could walk towards the front of the plane and was asked to proceed along the 90-degree exit path.

In addition to Inlow's previous missteps, at least one other Conseco passenger walked to the front of the helicopter while disembarking. Fortunately, he was not struck by the blade. Despite these prior occurrences and knowledge of dangerous conditions within Conseco's organization, Conseco did not alter its policies, and Inlow was not given a briefing before disembarking nor escorted to safety on the day of his death.

Inlow, after beginning to walk on roughly the correct line of exit, abruptly turned and walked fully upright back to the helicopter. He proceeded to move in front of the helicopter into the path of the blades. He was struck by a blade at about the one o'clock position off the nose of the helicopter. The blades were turning at approximately 150 r.p.m.s, or about 200 miles per hour (less than half of what they would be turning under flying speed power).

In contrast, Colliflower, the Conseco attorney accompanying Inlow, instinctively (it was his first helicopter ride—despite this, he received no safety briefing from the pilots) crouched as he followed Inlow off the aircraft. Although Colliflower's pre-flight jitters were assuaged by the thought

that he could simply follow Inlow's lead, when Inlow turned and walked towards the front of the Dauphin, Colliflower did not follow.

Deaton, manning the controls in the cockpit, said that nothing appeared to be unusual about the rotor blade path; he testified that it appeared that Inlow simply walked into the path of the blades, a place Deaton never expected anyone to be.[2]

### D.  Procedural History

The district court, after carefully considering the complicated issues presented by this case, granted Eurocopter's motion for summary judgment on three grounds: (1) that the danger that befell Inlow was open and obvious and therefore Eurocopter did not have a duty to warn Conseco or Inlow of the danger; (2) that, even assuming the danger was not open and obvious because of the increased risk of blade flap during deceleration, the pilots in the employ of Conseco served as sophisticated intermediaries who relieved Eurocopter of the duty to warn Conseco or Inlow; and (3) that the Dauphin was not "unreasonably dangerous" under the Indiana Products Liability Act ("IPLA") and therefore the Inlow Estate could not proceed with the suit.

Eurocopter requests that we affirm on any of these grounds, or on alternate theories—either that the failure to warn could not have been the proximate cause of the accident as

---

[2]  Deaton explained: "Now, I know mentally that this thing is supposed to be eight feet tall. Larry is six feet tall. I can't tell you where that two feet went. I know from my observation watching this thing spool down everything was correct. The cyclic was where it was—normally was. I was guarding it with my hand. The tip path plane was where it should have been. No vibrations. Everything looked good. Next thing I know I see Larry [Inlow] coming out of my peripheral vision. Now I've got something that has a sight picture. I can see Larry's not going to make it."

a matter of law or that the IPLA affirmative defense of "incurred risk" was proven as a matter of law, thus eliminating all liability. The Inlow Estate insists that the district court erred in its application of the IPLA and that a trial is appropriate to decide whether Eurocopter negligently caused this accident by its failure to warn Conseco of the dangers of blade flap.

An additional issue on appeal is whether the district court abused its discretion in granting summary judgment to Eurocopter without first deciding a pending motion to compel discovery by First National. The district court held that because the Inlow Estate did not invoke Rule 56(f) of the Federal Rules of Civil Procedure to assert that the pending discovery disputes prevented it from obtaining evidence it needed to oppose the summary judgment motion, the motion was ripe for decision and the judge denied the pending discovery motion as moot.

## II.  Analysis

We review de novo the district court's grant of summary judgment, construing all facts and inferences in the light most favorable to the non-moving party. *Ritchie v. Glidden Co.*, 242 F.3d 713, 720 (7th Cir. 2001). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A.  Applicable Law

As a federal court sitting in diversity, we apply state substantive law and federal procedural law. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 754 (7th Cir. 2004). Thus, the

product liability claim against Eurocopter is governed by the IPLA, Ind. Code §§ 33-1-1.5-1, *et seq.* (1995).[3]

The Inlow Estate must show the following to succeed on its product liability claim under the IPLA: "(1) the seller is engaged in the business of selling the product that caused the injury; (2) the product was defective and unreasonably dangerous; (3) the defect existed at the time the product left the defendant's control; (4) the product was expected to and did reach the consumer without substantial change in its condition; and (5) the defective product was the proximate cause of plaintiff's injuries." *Ritchie*, 242 F.3d at 720. Only the second and fifth requirements are at issue on appeal.

Was the Dauphin defective and unreasonably dangerous? In order to show that the product is defective and unreasonably dangerous under the IPLA, a plaintiff must establish either a manufacturing defect, a design defect, or a failure to warn. Here, the Inlow Estate claims only that Eurocopter was negligent in failing to warn Conseco executives.[4] Also at issue is whether Eurocopter's alleged failure to warn was a proximate cause of Inlow's accident.

---

[3] "This chapter governs all actions brought by a user or consumer against a manufacturer or seller for physical harm caused by a product regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 33-1-1.5-1. The IPLA was amended and recodified at Ind. Code §§ 34-20-1-1, *et seq.* in 1998. The version cited in the text is controlling because Inlow's accident occurred prior to the effective date of the current version of the statute.

[4] Both Indiana's 1995 statute (applicable to this case) and its 1998 statute abandoned strict liability in design defect and failure to warn cases. Hence, unlike manufacturing defects, for which manufacturers are still held strictly liable, claims of design defect and failure to warn must be proven using negligence principles.

## B.  Negligent Failure to Warn Under the IPLA

The facts we have recited establish that there are many who could be blamed for this terrible accident. For one, Conseco did not thoroughly consider flight safety. Its executives could have investigated the best way to disembark, given more deference to the judgment of the helicopter pilots within the organization, or ensured that ground crews were present at every disembarkment. Second, the pilots could have reminded Inlow of the proper, 90-degree exit path, physically forced him to walk this path in light of his past behavior, or insisted that their instincts on flight safety should have been followed despite Conseco's flight policy. And, of course, Inlow himself decided to walk upright, directly in front of the helicopter. These observations notwithstanding, the task at hand is to analyze the culpability of Eurocopter.

### 1.  Duty to Warn

Under Indiana law, there is a duty to warn reasonably foreseeable users of all "latent danger[s] inherent in the product's use." *Taylor v. Monsanto Co.*, 150 F.3d 806, 808 (7th Cir. 1998); *see also Ritchie*, 242 F.3d at 720-21; *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997) ("[A] latent danger will, without more, cause the product to be unreasonably dangerous as marketed.").[5] The duty is to warn of the hidden danger itself or the risks in a

---

[5]  In failure to warn cases, the "unreasonably dangerous" inquiry is not a separate inquiry from whether the defect is latent or hidden. *See* Ind. Code § 33-1-1.5-2(7) (defining unreasonably dangerous as "any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases it with the ordinary knowledge about the product's characteristics common to the community of consumers").

recognized danger that far exceed that contemplated by the ordinary consumer, not to educate the user as to the particular degree of harm that a known danger could inflict. *See McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 656-57 (7th Cir. 1998) (holding that a manufacturer of a coffee pot does not have the duty to warn consumers of the precise capabilities of its coffee to burn the skin when consumers already know that coffee is extremely hot and can burn the skin); *Moss v. Crosman Corp.*, 136 F.3d 1169, 1175 (7th Cir. 1998) (holding that the air rifle at issue "did not place users at risk of injuries different in kind from those that an average consumer might anticipate" by causing the death of a boy when a pellet penetrated his eye and entered his brain).

There is no duty to warn of open and obvious dangers because a warning would be redundant. "[T]here is no duty to warn that 'a knife or an ax will cut, a match will take fire, dynamite will explode, or a hammer may mash a finger.'" *Burton v. L.O. Smith Foundry Prods. Co.*, 529 F.2d 108, 111 (7th Cir. 1976) (quoting W. Prosser, *Handbook of the Law of Torts* 649 (4th ed. 1971)). Was the danger presented by the rotor blades of the Dauphin "open and obvious" and therefore not "latent" or hidden?[6]

The dangers presented by a competing helicopter with a lower rotor set at body height, like the Sikorsky S-76, may be so obvious that no warning would be necessary or helpful. But it is not obvious that the Dauphin's high-set rotor provides reliable safety for exiting passengers only when it is turning at flight speed. The Dauphin could create a false sense of security in its users, prompted to buy the Dauphin precisely because they thought it was safe for inexperienced

---

[6] We note that the Inlow Estate is not claiming that the Dauphin was defectively designed. In a sense, it is conceded that the dangers inherent in the Dauphin are a necessary part of its functionality.

passengers. Similarly, in *Downs*, 685 N.E.2d at 162, the manufacturer used an odorant to signal natural gas leaks, but did not warn of the limitations of this safety measure.

Deceleration-enhanced blade flap is a hidden danger of the Dauphin for which Eurocopter had a duty to warn its customers, in this case, Conseco. *Cf. Kroger Co. Sav-On Store v. Presnell*, 515 N.E.2d 538 (Ind. Ct. App. 1987) ("[I]f people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious.") (quotation omitted).

### 2. Breach of Duty

"A product is defective under this chapter if the seller fails to: (1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer." Ind. Code § 33-1-1.5-2.5(b).[7] This inquiry goes to breach: did Eurocopter adequately warn and/or instruct Conseco and Inlow on the dangers of the Dauphin and/or the proper use of the helicopter? In general, "the adequacy of the warning is a question of fact for the jury." *Downs*, 685 N.E.2d at 161.

---

[7] To make certain that it was understood that a negligence standard applied, the statute also states that "in any action based on an alleged design defect in the product or based on an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions." Ind. Code § 33-1-1.5-3(b).

The district court held that Eurocopter satisfied its duty to warn as a matter of law under the sophisticated intermediary doctrine.[8] "Although the duty to warn end users of potential dangers is generally non-delegable, Indiana law does recognize an exception to this general rule." *Ritchie*, 242 F.3d at 724 (citing *Downs*, 685 N.E.2d at 163). This exception, the sophisticated intermediary doctrine, is applicable if: (1) the product is sold to an intermediary with knowledge or sophistication equal to that of the manufacturer; (2) the manufacturer adequately warns this intermediary; and (3) the manufacturer can reasonably rely on the intermediary to warn the ultimate consumer. *Taylor*, 150 F.3d at 808. Additional factors should be considered when determining whether to apply the doctrine in a particular case. These include:

> [t]he likelihood or unlikelihood that harm will occur if the intermediary does not pass on the warning to the ultimate user, the [ ] nature of the probable harm, the probability or improbability that the particular intermediary will not pass on the warning[,] and the ease or burden of the giving of the warning by the manufacturer to the ultimate user.

*Ritchie*, 242 F.3d at 724 (quotation omitted).

In general, summary judgment should not be granted in favor of a manufacturer based on the sophisticated interme-

---

[8] The sophisticated intermediary doctrine is very similar in substance to the "sophisticated user" exception to the duty to warn under Indiana law. *See Smock Materials Handling Co., Inc. v. Kerr*, 719 N.E.2d 396, 403 n.4 (Ind. Ct. App. 1999); *Downs*, 685 N.E.2d at 162 n.10. The difficulty in this case is determining whether Inlow, as an individual passenger, is the end user of the product, or whether Conseco (including its professional pilots) as an organization is the end user. We are inclined towards the former and therefore analyze the issue as a sophisticated intermediary case rather than a sophisticated user case.

diary doctrine. *Id.* ("[W]hether a manufacturer has adequately discharged its duty to warn to qualify for the sophisticated intermediary defense is a question for the trier of fact."); *Downs*, 685 N.E.2d at 164.

Here though, as in *Taylor*, 150 F.3d at 809-10, the record justifies an exception to the general rule. For one, Conseco's licensed, trained, professional staff of pilots understood the dangers of blade flap. This is why several pilots complained to Conseco executives about the disembarkment policy. It was recognized by each pilot, including Deaton (on duty the day of Inlow's death), that exiting the Dauphin while the blades decelerated posed significant dangers.

Second, as information about blade flap was readily available to the Conseco pilots in their training and in materials familiar to them as professional pilots (like safety manuals and government regulations), any lack of direct warning by Eurocopter to the pilots is inconsequential in this case. *See Phelps v. Sherwood Med. Indus.*, 836 F.2d 296, 304 (7th Cir. 1987) (manufacturer has no duty to warn sophisticated intermediary "of those dangers which he already knew"); *Smock Materials Handling Co., Inc.*, 719 N.E.2d at 403 ("Actual or constructive knowledge may arise where . . . information of the product's dangers is available in the public domain.") (quotation omitted). Examples of such information abound in the record, and we cite several such examples by way of illustration:

- A 1983 Federal Aviation Administration circular advised: "The engine of a . . . helicopter should be shut down before boarding or deplaning passengers. This is the simplest method of avoiding accidents." (Def. Ex. R.)

- Indiana's occupational safety regulations require an employer to ensure "that whenever approaching or leaving a helicopter which has its blades rotating, all employees shall remain in full view of the pilot and keep in a crouched position. No employee shall be

permitted to work in the area from the cockpit or cabin rearward while blades are rotating, unless authorized by the helicopter operator to work there." 29 C.F.R. § 1910.183(p) (incorporated by reference at 620 Ind. Admin. Code § 1-1-2(10)).

• The Safety Manual of the Helicopter Association International cautions: "WARNING! Do not attempt to lead passengers near a rotor disc while rotors are turning, unless passengers have been briefed on the hazards of main rotors and tail rotors. Shut down the helicopter prior to boarding passengers or use ground crews to assist passengers. . . . WARNING! Main rotor blades can dip very low when rotating slowly. Passengers and crew must be briefed not to stand or walk under the rotor system during low R.P.M. operations. Under no circumstance should any person, whether passenger or crew, be permitted to approach or leave the aircraft during rotor engagement on start-up or until after the rotor blades have completely stopped following engine shutdown." (Def. Ex. T, U.)

• A 1992 training book, titled "Learning to Fly Helicopters," warns: "The most dangerous time to be near a helicopter is when the rotors are starting or stopping. When the rotors are stopped, special devices called droop stops keep the blades from hanging down too low. When the rotors are rotating at normal speed, the rotors can droop down quite low, but the pilot has full control of their position with the cyclic and collective sticks. During start-up, after the droop stops move out of position but before the rotor blades are up to normal r.p.m., the blades are not moving fast enough to be fully controllable by the pilot and are therefore very susceptible to wind gusts. A gust of wind at the wrong instant can cause a main rotor blade to flap down so low that it can hit the top of the cockpit or tailboom. This is the main reason why helicopters have wind limitations for

> start-up and shutdown. Needless to say, a blade could also flap down low enough to hit a person standing within the circumference of the rotor disc. It has happened. (Def. Ex. W at 70.)

Third, and finally, it was more than reasonable for Eurocopter to expect the pilots to pass on the warning to the Conseco executives. And the pilots did warn the executives that the disembarkation policy was unsafe and should be changed! Conseco's executives simply ignored this advice.

Inlow was directly warned more than once that tragedy could strike if he persisted in walking in front of the Dauphin when disembarking. The fact that Conseco and Inlow chose to ignore admonishments from the professional pilots does not alter the fact that the pilots are sophisticated intermediaries. No jury could find that it was unreasonable for Eurocopter to expect Conseco's pilots to understand rotor blade dangers and to protect Conseco passengers from those dangers.

Because we agree with the district court in holding that Eurocopter may not be held liable as a matter of law under Indiana's sophisticated intermediary doctrine, we need not analyze the issue of proximate cause or the affirmative defense of incurred risk.

## C. Judgment Without Deciding the Inlow Estate's Motion to Compel

A district court's entry of summary judgment before ruling on a pending motion to compel is a discovery matter that this court reviews for an abuse of discretion. *Doty v. Ill. Central R.R. Co.*, 162 F.3d 460, 461 (7th Cir. 1998).

Under Rule 56(f), "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify

the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." The Inlow Estate did not submit such an affidavit to the district court. Instead, it argued that the district court should compel Eurocopter to comply with aspects of the discovery plan in order to complete discovery.

Because the Inlow Estate failed to submit a Rule 56(f) affidavit, claiming that it could not adequately oppose the motion for summary judgment by reason of incomplete discovery, it was not an abuse of discretion by the district court to rule on the motion for summary judgment before the Inlow Estate was satisfied that all necessary discovery had occurred. *See Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co., Inc.*, 826 F.2d 725, 727 (7th Cir. 1987). Even when a non-moving party requests postponement of a motion for summary judgment to allow discovery, the failure to "file an affidavit outlining [the party's] reasons for needing further discovery as contemplated by Rule 56(f) . . . alone justifies affirmance[.]" *Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000).

## III.  Conclusion

For the foregoing reasons, we AFFIRM the grant of summary judgment to Eurocopter.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*