# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3484

FRANCIS GUTIERREZ and JOSEPH RYDEL,

*Plaintiffs-Appellants*,

v.

AT&T BROADBAND, LLC and COMMUNICATIONS
AND CABLE OF CHICAGO, INC.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 7025—**Amy J. St. Eve**, *Judge.*

———————

ARGUED JUNE 8, 2004—DECIDED SEPTEMBER 1, 2004

———————

Before EASTERBROOK, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.*

## I. History

Francis Gutierrez and Joseph Rydel both contracted for cable television service with an entity known to them only

as "AT&T Broadband."[1] Both disputed charges that appeared on their cable bills, both refused to pay, and both accounts were ultimately turned over to Credit Protection Association ("CPA"), a third-party collections agency. The letters they received from CPA represented that it was collecting debts on behalf of "AT&T Broadband."

Unknown to Gutierrez and Rydel, "AT&T Broadband" was not the name of a real entity or their actual creditor. Instead, it was the brand name used by their true creditors, cable franchisees LaSalle Telecommunications, Inc. and Communications and Cable of Chicago, Inc. (collectively, "Chicago Cable"). Confusingly, an entity with the name AT&T Broadband, LLC (as opposed to "AT&T Broadband"— no LLC) does exist. And complicating matters further, Chicago Cable and AT&T Broadband, LLC are sister corporations, falling under the massive umbrella of their mutual parent, AT&T Corp.

When Rydel decided to file a state court class action in Illinois over the disputed charges, he did so against AT&T

---

[1] The parties do not dispute that when Gutierrez and Rydel first ordered cable, they did so through "AT&T Cable Services." The work orders for cable installation that bear their signatures display, in the upper left-hand corner, AT&T's familiar trademark consisting of the globe design and the word "AT&T," with "AT&T Cable Services" appearing immediately below. The parties also do not dispute that "AT&T Cable Services" later changed its name to "AT&T Broadband" to reflect that consumers could obtain high-speed Internet access as well as cable television service through that provider. The change appears to have taken place sometime in the fall of 2000. Rydel signed up for cable in April of 2000, and most of the documents received by him pertinent to this suit list "AT&T Cable Services" as his provider. Gutierrez, who signed up for cable in September of 2000, received documents mainly listing "AT&T Broadband" as her provider. For ease and consistency, we refer to the provider as "AT&T Broadband" throughout, except where it becomes significant to our analysis.

Broadband, LLC ("Corporate Broadband"), believing it to be his creditor. Corporate Broadband then moved to dismiss the complaint against it, claiming that Rydel sued the wrong entity. It was then that Rydel learned that "AT&T Broadband" (the brand name) and AT&T Broadband, LLC (the corporate entity) were purportedly not the same and that his true creditor was Chicago Cable.[2]

This revelation—that Chicago Cable provided Rydel's cable service and was his true creditor, not Corporate Broadband—led to the instant suit under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.* Both Gutierrez and Rydel sued Corporate Broadband under § 1692j for allegedly "design[ing], compil[ing], and furnish[ing] any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor is participating in the collection of . . . a debt . . . ." In support of their claim, plaintiffs point to, among other documents, their bills and collection letters that direct payment be made to "AT&T Broadband" (not AT&T Broadband, LLC), at a Denver, Colorado address where Corporate Broadband receives mail. Because of the Denver address and the use of the name "AT&T Broadband," the plaintiffs argue that Corporate Broadband must have been the entity that designed, compiled and furnished the bills and collection letters. They further allege that the documents deliberately deceived them into thinking Corporate Broadband, and not their true creditor Chicago Cable, was attempting to collect their debts. The problem with that, the plaintiffs urge, is Corporate Broadband led them to believe they were dealing with communications giant AT&T, and not the lowly franchisee, Chicago Cable,

---

[2] At oral argument, counsel for the defendants assured us, without contradiction from the plaintiffs, that the state court matter Rydel filed relating to the billing dispute remains alive, despite initially naming the wrong entity, Corporate Broadband.

in an attempt to intimidate them into paying their cable bills above other possible outstanding debts.

Plaintiff Rydel (Gutierrez does not join in this count of the complaint) also alleged that Chicago Cable violated § 1692e, which makes it unlawful for a debt collector to use any false, deceptive, or misleading representations or means in connection with the collection of any debt. Rydel argues that Chicago Cable meets the definition of "debt collector" under the FDCPA because, "in the process of collecting his own debts, [Chicago Cable] use[d] any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). Rydel asserts that even though Chicago Cable represented itself as "AT&T Cable Services" or "AT&T Broadband" throughout its relationship with him, the bills requesting payment to "AT&T Cable Services" and the collection letter listing "AT&T Broadband" as payee amounted to the use of a name other than Chicago Cable's own, indicating that a third person ("AT&T Cable Services" or "AT&T Broadband" or, perhaps even Corporate Broadband) was attempting to collect his debts. Again, the problem with Chicago Cable's behavior, Rydel alleges, relates to its tapping into the power of its parent, AT&T, producing undue pressure on him to pay his bills. And, because "AT&T Cable Services" and "AT&T Broadband" were not registered assumed names of Chicago Cable under Illinois law and not registered service marks under federal trademark law, Rydel complains that he had no means of identifying his true creditor, resulting in the mistake in state court where he wrongly filed against Corporate Broadband.

The district court granted summary judgment to both Corporate Broadband and Chicago Cable. Gutierrez and Rydel timely appeal, and we affirm.

## II. Analysis

### A. Heller, Ryczek, and Politano Affidavits

Before we turn to the merits of the district court's decision, we must first address the plaintiffs' complaint that the district court abused its discretion in refusing to strike three affidavits the defendants proffered in support of their summary-judgment motion. The plaintiffs argue in the alternative that if the district court was unwilling to strike the affidavits, it should have reopened discovery for the limited purpose of allowing plaintiffs the opportunity to depose the three affiants.

It is questionable whether the plaintiffs' half-hearted request for additional discovery below preserved the issue for appeal. After making a fully-developed argument requesting that the district court strike the offending affidavits (a fairly harsh remedy), the plaintiffs' request for more depositions appeared as an afterthought at the end of their reply brief in support of their motion to strike. The motion nowhere mentioned Federal Rule of Civil Procedure 56(f) (which specifically provides for reopening of discovery in the midst of summary judgment briefing), and was unsupported by affidavits as generally required by Rule 56(f). *See Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000) (finding that failure to file an affidavit in support of a Rule 56(f) motion alone justifies the district court's decision to deny the additional discovery), *cited with approval in First Nat'l Bank & Tr. Corp. v. Am Eurocopter Corp.*, No. 02-2274, 2004 U.S. App. LEXIS 16360, at *30 (7th Cir. Aug. 9, 2004).

Even giving the plaintiffs the benefit of the doubt as to the viability of their request to remand this case for additional discovery, we find no reason to disturb the district court's decision to allow the three depositions to stand, which we review for an abuse of discretion. *See McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 617 (7th Cir. 2001); *Woods*, 234 F.3d at 990.

### 1. Heller Affidavit

The district court refused to strike Jennifer Heller's affidavit because the plaintiffs admitted all material facts for which the affidavit was cited in support; thus, the district court reasoned, defendants' reliance on the Heller affidavit did not prejudice the plaintiffs.

The plaintiffs counter that Heller's affidavit contained a statement with which they did not agree. Yet, we observe that the defendants did not cite to or rely upon the specific paragraph plaintiffs dispute in support of their summary-judgment motion. Rather, the defendants used Heller's affidavit solely to outline AT&T Corp.'s corporate structure during the time period relevant to this case and to explain the parent-subsidiary relationships among the various entities at issue. (R. 52, ¶¶ 6-9, 18.) The plaintiffs admitted these particular facts. (R. 59, ¶¶ 6-9, 18.)

There is no evidence that the district court, in ruling on the defendants' summary-judgment motion, relied on Heller's affidavit except for the propositions for which it was specifically cited (and with which the plaintiffs have no argument). Because Heller's affidavit in no way prejudiced the plaintiffs' ability to oppose the defendants' summary-judgment motion, the district court properly refused to strike it or to reopen discovery to allow Heller's deposition.

### 2. Ryczek Affidavit

We agree with the district court that the plaintiffs were on notice prior to the close of discovery that Martha Ryczek, Chicago Cable's collections manager, had information pertinent to this matter and was a potential witness, despite the fact that she was not listed in any of the defendants' discovery responses or offered in response to the plaintiffs' Rule 30(b)(6) deposition notice. Because the plaintiffs had a fair opportunity to seek discovery from Ryczek prior to the

deadline for filing summary-judgment motions, the district court did not abuse its discretion in refusing to strike her affidavit or allow additional discovery.

Richard Baucom, the defendants' designated Rule 30(b)(6) deponent, discussed Ryczek and her job responsibilities during his deposition in response to detailed questions by the plaintiffs' counsel. Those questions were quite clearly directed at finding additional witnesses who would assist plaintiffs in the discovery process. We reproduce the relevant deposition testimony in full:

Q: Who sets computer-set standards for sending a bill from your company to Credit Protection Association, L.P.?

A: Designated employees within our organization.

Q: Who would be such a designated employee within your organization?

A: A Martha Ryczek.

Q: Spell her last name, please?

A: R-y-c-z-e-k.

Q: What is her title?

A: Credit and Collections Manager.

Q: And where does she work?

A: Schaumburg.

Q: And does she do the day-to-day operations as it relates to collection of accounts for your company?

A: Define "day-to-day operations."

Q: She's the one who oversees collectors making phone calls, making sure that they do them in a certain way, making certain that letters are sent out in a certain manner and in a certain frequency and so forth?

A: It would be under her purview. She does not do it directly.

Q: But she's the one in charge?

A: Yes. She reports to me.

Q: Okay. She reports to you and you supervise her only in a very—in a limited fashion? You don't like watch over her to see that she's running things in [sic] a day-to-day basis?

A: No.

Q: No, that's correct or no, I'm incorrect?

A: No, that's correct.

Q: Okay. This is like hide and seek. I'm actually trying to find the people who are going to be responsive to my requests.

(R. 62, Ex.12 at 118-19); *see also* (R. 62, Ex. 3 at 29-30) (Ryczek mentioned, six days after Baucom's deposition, by Diane Evans, debt collector CPA's representative, as CPA's Chicago-area collections manager contact at AT&T Broadband to whom they report.)

Plaintiffs argue now that the above did not put them on notice that Ryczek possessed relevant information about Chicago Cable's internal and external collection processes, reasoning that because she reported to Baucom, Baucom would possess the same information as Ryczek. But Baucom's and Evans's testimony should have alerted the plaintiffs that Ryczek would have more and better information with regard to collections than would Baucom. Specifically, their testimony revealed that Ryczek oversaw Chicago Cable's day-to-day collections operation, was supervised only minimally by Baucom, and was CPA's direct client contact.[3]

---

[3] In particular, the plaintiffs protest that Ryczek's surprise affidavit testimony stating that Chicago Cable's billing system auto-
(continued...)

Based on the above, we cannot conclude that the district court abused its discretion in allowing Ryczek's affidavit to stand. Although the defendants did have an obligation to seasonably supplement their Rule 26(a) disclosures and interrogatory responses, such amendments are required only in certain circumstances, such as when the additional information "has not otherwise been made known to the other parties during the discovery process . . . ." Fed. R. Civ. P. 26(e)(1), (2); *see also David v. Caterpillar, Inc.*, 324 F.3d 851, 856 (7th Cir. 2003). Here, the plaintiffs knew of Ryczek and the fact she possessed information relevant to this case through Baucom's and Evans's depositions.

Finally, although we in no way condone the defendants' choice to provide Baucom, a largely unresponsive witness, as their Rule 30(b)(6) deposition representative, we also note that the plaintiffs made a tactical decision not to insist that the defendants produce better witnesses after Baucom proved inadequate. Such a request very likely would have been viewed favorably had it been made prior to the close of discovery, with possible sanctions levied against the defendants for failing to provide an appropriate deponent in the first instance. Yet, the plaintiffs raised their dissatisfaction with Baucom after the close of discovery, in the midst of summary-judgment briefing, and with prior knowledge that better witnesses, like Ryczek, existed. The district judge was not required to belatedly punish the defendants by striking Ryczek's affidavit or reopening discovery in such circumstances. *See, e.g., Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002) ("Where a party's own lack of diligence

---

[3] (...continued)
matically forwarded Rydel's account for collection damaged their case. But, as reflected at the beginning of the deposition excerpt quoted above, the plaintiffs directly asked Baucom who set the computer-set standards for forwarding a bill to CPA. He told them that Ryczek did.

is to blame for that party's failure to secure discoverable information, it is not an abuse of discretion to deny a Rule 56(f) motion."), *cert. denied*, 124 S. Ct. 155 (2003); *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1057 n.5 (7th Cir. 2000) (quoting *Pfeil v. Rogers*, 757 F.2d 850, 857 (7th Cir. 1985)).

### 3.  Politano Affidavit

The district court also found that the plaintiffs were adequately on notice that Politano was a potential witness. Although we found the district court to be on firm ground with respect to Ryczek, we cannot agree this was the case with Politano.

The plaintiffs admit they had seen Politano's name on a service mark application they uncovered through their own Internet search of the United States Patent and Trademark Office's website; it was not a document produced to the plaintiffs by the defendants. That document showed that "AT&T Broadband" was registered as a service mark of AT&T Corp., that the application was filed December 6, 2001 (three months after the filing of the present lawsuit), and that the attorney of record was Politano. The plaintiffs asked Baucom, the defendants' Rule 30(b)(6) designee, "Do you know who Frank Politano is?" Baucom responded, "No, I do not." Politano, it turns out, works for the parent, AT&T Corp., as its trademark and copyright counsel. His affidavit was offered to explain how Chicago Cable, an AT&T Corp. subsidiary, came to provide cable services under the brand name "AT&T Broadband."

We do not believe that the service mark application and Baucom's deposition testimony were enough to put the plaintiffs on notice that Politano possessed information pertinent to their claims such that they would be expected to request his deposition or anticipate that his affidavit might be offered in support of the defendants' summary-judgment

motion. No witness indicated Politano possessed information pertinent to this matter or was even employed by AT&T during the relevant time period.

We believe that the correct course would have been to reopen discovery to allow for Politano's deposition. Yet, despite the district judge's misstep with respect to her analysis on this issue, we do not find it necessary to remand the case for further proceedings. Because the plaintiffs also assert that striking the affidavit would have been a proper remedy below and because we are obligated to review the district judge's summary-judgment decision de novo, *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 782 (7th Cir. 2004), we can ignore Politano's affidavit and any statements of material fact for which it was offered in support and proceed to the merits of the plaintiffs' claims. Even without Politano's affidavit testimony, which established only a narrow set of facts with regard to Rydel's § 1692e claim, we believe the district court properly granted summary judgment in favor of the defendants.

## B.  Gutierrez's and Rydel's § 1692j Claim Against AT&T Broadband, LLC

Section 1692j(a) of the FDCPA provides:

> It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

The plaintiffs claim here that Corporate Broadband designed, compiled and furnished billing statements, a certain notice, and collection letters knowing that the documents would make the plaintiffs falsely believe that it, rather than Chicago Cable, was attempting to collect their debts.

The purpose of § 1692j is to prohibit "flat-rating." *See White v. Goodman*, 200 F.3d 1016, 1018 (7th Cir. 2000). "The classic 'flat-rater' effectively sells his letterhead to the creditor, often in exchange for a per-letter fee, so that the creditor can prepare its own delinquency letters on that letterhead. Use of a third party's letterhead gives the delinquency letters added intimidation value, as it suggests that a collection agency or some other party is now on the debtor's back." *Nielsen v. Dickerson*, 307 F.3d 623, 633 (7th Cir. 2002) (internal citations omitted). Plaintiffs do not contend Corporate Broadband engaged in flat-rating. Instead, they urge us to apply § 1692j to thwart the kind of deceit they say Corporate Broadband perpetrated in allowing its address and a variation of its name to appear on at least three types of documents arguably used in Chicago Cable's debt collection process—the monthly bills sent by Chicago Cable, a document titled "Important Notices to Our Customers," and the collection letters sent by CPA.[4]

---

[4] We note that the parties dispute what documents this court should consider when deciding if Corporate Broadband designed, compiled, and furnished "any form" intending to deceive the plaintiffs into thinking some entity other than Chicago Cable was attempting to collect their debt. *See* 15 U.S.C. § 1692j(a). Corporate Broadband argues, for various reasons, that we should limit our inquiry to the debt collection letters sent by the third-party debt collector, CPA. The plaintiffs state that we should consider the third-party debt collection letters, as well as monthly bills sent prior to the plaintiffs being turned over to CPA, and the document titled "Important Notices to Our Customers." Ultimately, we need not decide the scope of the term "any forms" for the purpose of a § 1692j inquiry, since there is no evidence that Corporate Broadband designed, compiled and furnished any of the documents at issue here or did so with the intent to deceive the plaintiffs.

### 1.  The Monthly Bills

For Corporate Broadband to have violated § 1692j, it must have "design[ed], compil[ed], *and* furnish[ed]" the allegedly deceptive forms. 15 U.S.C. § 1692j(a) (emphasis added); *see also Laubach v. Arrow Serv. Bur., Inc.*, 987 F. Supp. 625, 630 (N.D. Ill. 1997) (noting that the conjunction "and" indicates that all three are required as elements of a § 1692j offense). The only evidence proffered by plaintiffs that Corporate Broadband designed, compiled, and furnished the plaintiffs' monthly bills is the address contained on the detachable payment coupon included with the bill, and, in the case of Gutierrez, the name of the payee.

Rydel's payment coupons directed him to make his checks payable to "AT&T Cable Services" and to send them to "AT&T Cable Services" at a Denver, Colorado post office box. After being notified of the name change from "AT&T Cable Services" to "AT&T Broadband," Gutierrez's payment coupon directed her to make her checks payable to "AT&T Broadband" (not AT&T Broadband, LLC) and to send them to "AT&T Broadband" (not AT&T Broadband, LLC) at the same Denver, Colorado post office box listed on Rydel's payment coupons. It is undisputed that Corporate Broadband receives mail at the post office box listed on the bills. However, it is also undisputed that Chicago Cable's billing system generates the information contained on cable subscribers' bills and that Chicago Cable sends those bills to its customers.

The plaintiffs request that we infer that Corporate Broadband "permitted" Chicago Cable to use its address on the bills (and in the case of Gutierrez, permitted the use of an abbreviated version of its name, "AT&T Broadband"). From this premise, the plaintiffs argue that permitting the use of its address (and, in the case of Gutierrez, its abbreviated name) meets § 1692j's requirement that Corporate Broadband "design, compile, and furnish" the allegedly decep-

tive form. They further allege that the plaintiffs were deceived by the bills into believing a third party—Corporate Broadband—was involved in the collection of their debt.

Although the record is far from clear, we will assume that the Denver address appears on the bills because Corporate Broadband "permitted" its use by Chicago Cable, and we will further assume that, to the extent the words "AT&T Broadband" appear in conjunction with the Denver address on Gutierrez's bills, Corporate Broadband intended it to represent an abbreviated version of its name and also permitted its use. However, "permitting" the use of a post office box not obviously associated with Corporate Broadband in Rydel's case (Corporate Broadband's name appears nowhere on the bill, and his bills directed payment to "AT&T Cable Services") surely does not amount to "designing, compiling, *and* furnishing" the bill, as is required under the Act. Rather, the undisputed evidence establishes that Chicago Cable designed, compiled, and furnished the bills to its customers. And, even though Gutierrez's bills contained both the Denver address and the payee "AT&T Broadband," plaintiffs present no case law that would support a finding that permitting two such pieces of information to appear on a bill designed, compiled, and furnished by the creditor amounts to a violation of § 1692j.

Moreover, if the primary purpose behind § 1692j is to protect consumers from believing that their debt has been turned over to some other entity as a means of intimidating them into paying, *see White*, 200 F.3d at 1018, the billing practice criticized here is not the kind of behavior the law was meant to discourage. Even though their bills directed payment to an unfamiliar address, the bills listed the payees as "AT&T Cable Services" or "AT&T Broadband" and were printed on paper bearing the blue globe logo appearing next to the familiar trademark "AT&T." The bills were consistent with the plaintiffs' understanding of the identity of their local cable service provider—both Gutierrez and

Rydel ordered cable in person from an individual they believed represented AT&T, and they both signed work orders bearing the AT&T logo and the name "AT&T Cable Services." Both admit that the name "AT&T Cable Services" was later changed to "AT&T Broadband" to reflect broader services, including Internet access. The bills, referencing the only entities with which they dealt throughout their cable acquisition, could not have deceived them into believing a third party—Corporate Broadband— was attempting to collect their debt, as they claim.

Put differently, where, as here, the plaintiffs' monthly bills provided consistent information both before and after the plaintiffs fell into arrears, it makes no sense to assert that a post office box and/or a name considered benign prior to the billing dispute takes on new meaning after the dispute; that the new meaning to be imputed is that a third party has been interjected into the process where none was suspected before; and that the plaintiffs' wills were over-borne by such a revelation. *See Nielson*, 307 F.3d at 633 (noting that § 1692j is designed to thwart debtor intimida-tion); *White*, 200 F.3d at 1018 (noting that Congress's con-cern in enacting § 1692j was to prevent deception inducing debtors to abandon legitimate defenses). Indeed, there is no evidence of any intimidation occurring here—Rydel at-tached no significance to the Denver, Colorado address on his bill when questioned about it during his deposition, the address wasn't even discussed in Gutierrez's deposition, and both plaintiffs admit that they believed they were dealing with AT&T throughout the events leading to this lawsuit. Thus, even if we decide, which we do not, that Corporate Broadband designed, compiled, and furnished the bills, no rational trier of fact could find that Corporate Broadband did so knowing that the bills would be used to deceive plaintiffs into believing that another entity, and not their cable service provider, was attempting to collect their debt, as required by the plain language of the Act. *See* 15 U.S.C. § 1692j.

### 2.  Customer Notice

The second document that allegedly draws Corporate Broadband under § 1692j is titled "Important Notices to Our Customers." Although the document itself appears in the record, there is no corresponding record support for the proposition that the plaintiffs actually received or saw the document prior to the initiation of the lawsuit, or that the document was designed, compiled, and furnished by Corporate Broadband.

Plaintiffs direct us to certain admissions by Corporate Broadband in support of such propositions, but those discovery responses only admit that certain information contained in the notice is accurate, and then go on to state that Corporate Broadband is unclear where plaintiffs obtained a copy of the notice and nowhere admits any involvement in the production of it. Plaintiffs' bald allegations that the notice was materially misleading, when they provide no affidavit or other testimony that they even received or relied on the document during their billing dispute, cannot create an issue of fact as to the deceptive nature of the document. Nor does the simple existence of the document, without more, support an inference that Corporate Broadband designed, compiled, and furnished the notice knowing that it would deceive the plaintiffs.


### 3.  Third-party Collection Letters

Finally, plaintiffs point to the collection letters sent to them by the third-party debt collector, CPA. They again allege that it was Corporate Broadband who actually designed, compiled, and furnished the letters because they refer to "AT&T Broadband" as the plaintiffs' cable service provider and creditor and provide a Denver, Colorado address.

According to the copies of the letters in the record, Rydel received two collection letters from CPA. Only the second

refers to "AT&T Broadband" as his creditor—the other refers to "AT&T Cable Services." Despite the difference in payee, both request, in the detachable payment coupon appearing at the bottom of the letter, that payment be sent to the same address—though not the Denver, Colorado post office box appearing on the payment coupon attached to the bills. The CPA letters request payment be sent to a Chicago, Illinois street address. Oddly enough, the one letter sent by CPA to Gutierrez refers to "AT&T Broadband" in the body of the letter, but the payment coupon requests remittance to "AT&T" and directs payment be sent to "AT&T Cable Services" at the Denver, Colorado post office box appearing on her bills.

As with the bills, the information contained in CPA's letters—directing payment to "AT&T Cable Services" or "AT&T Broadband" at a local Chicago address in Rydel's case or to "AT&T Cable Services" at the Denver, Colorado address in Gutierrez's case—does not remotely imply that Corporate Broadband designed, compiled, and furnished the letters or result in confusion that Corporate Broadband is actually attempting to collect the debt. Second, and more importantly, it is undisputed that CPA formulated the collection letters with the advice of its counsel and sent them to the plaintiffs. Though Corporate Broadband does admit that it reviewed some of the form letters sent by CPA (not necessarily the particular form letters sent to plaintiffs), simply reviewing such documents does not trigger liability under § 1692j.

For all of the above reasons, the district court properly granted summary judgment in favor of Corporate Broadband.

### C. Rydel's § 1692e Claim Against Communications and Cable of Chicago, Inc.

Rydel alleges that Chicago Cable violated § 1692e, which provides:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

\*\*\*

(10 ) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

\*\*\*

(14) The use of any business, company, or organization name other than the true name of the debt collector's business company or organization.

Rydel claims that Chicago Cable violated this provision of the FDCPA when it held itself out as "AT&T Cable Services" or "AT&T Broadband" during its relationship with Rydel, thus deceptively using a name other than its true name.[5]

For Chicago Cable to be liable under § 1692e, though, it must be a "debt collector" as defined by the statute. Rydel does not dispute that Chicago Cable was the franchisee that provided his cable service and that any debt he owed, he owed to Chicago Cable. Typically, Chicago Cable would be considered a "creditor" for FDCPA purposes, and not a debt collector. *See* 15 U.S.C. § 1692a(4) ("The term 'creditor' means any person who offers or extends credit creating a debt or to whom a debt is owed . . . ."). Yet, Rydel argues that Chicago Cable falls into the "false-name" exception listed in § 1692a(6): "[T]he term ['debt collector'] includes any creditor who, in the process of collecting his own debts,

---

[5]  We note that only the last written communication received by Rydel—the second collection letter sent by CPA—referred to Rydel's creditor as "AT&T Broadband," not "AT&T Cable Services."

uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." Where § 1692j prohibits third parties from peddling their influence to creditors through "flat-rating," § 1692a(6) is the other side of the coin, prohibiting creditors from using the materials provided by flat-raters to intimidate their debtors into paying. *See White*, 200 F.3d at 1018.

Our task, then, is to first determine whether Chicago Cable 1) in the process of collecting its own debts, 2) used a name other than its own, 3) which would indicate that a third party was attempting to collect Rydel's debts. *See* § 1692a(6). If Chicago Cable does not fall into this exception, it cannot be liable under § 1692e as a debt collector.

Rydel alleges that Chicago Cable used a false name in two phases of the debt collection process: first, while attempting to collect on Rydel's past-due account in-house and second, after the debt had been referred to CPA for processing. We can easily dispense with any claim that Chicago Cable's actions *after* Rydel's account had been referred to CPA for collection qualifies it for the § 1692a(6) exception. At that point, Chicago Cable was no longer in the process of collecting its own debts; that work was the responsibility of CPA, an undisputed debt collector. *See* 15 U.S.C. § 1692a(6). Because Chicago Cable was not in the process of collecting its own debts during the second phase of the collection process involving the third-party debt collector CPA, Chicago Cable does not qualify as a debt collector under § 1692a(6) and cannot be held liable under § 1692e for any representations made in the letters sent by CPA.

As to the first phase of the collection process, Rydel argues that Chicago Cable, falsely representing itself as "AT&T Cable Services," attempted to prompt him to pay his debts through sending monthly service bills, which listed his accumulating arrearages. In that case, Chicago Cable would be in the process of collecting its own debts, meeting prong one of the exception.

Whether the name "AT&T Cable Services" is a name other than Chicago Cable's own, as required in prong two, is an open question.[6] What is undisputed is that Chicago Cable represented itself as "AT&T Cable Services" throughout its own attempts to collect Rydel's debt, never once representing itself as Chicago Cable or anything other than "AT&T Cable Services." What is also undisputed is that Chicago Cable's holding itself out as "AT&T Cable Services" on its bills was consistent with every other contact Rydel had with Chicago Cable. For example, when Rydel signed up for cable services, he did so on an "AT&T Cable Services" purchase order with a service representative that he understood to be from AT&T. After his cable was disconnected for non-payment, he received telephone calls from individuals representing AT&T Cable Services.

Regardless of whether Chicago Cable was entitled to represent itself as "AT&T Cable Services," the name "AT&T Cable Services" on Rydel's bills could not have left Rydel, or any unsophisticated consumer, with the impression that a third party was involved in the debt collection process. Indeed, "AT&T Cable Services" was the *only* party of whom he was aware and was the entity to which he believed he owed the debt. It would have created more confusion had Chicago Cable, once Rydel fell into arrears, started listing itself on his cable bills as his creditor instead of the name in which all other business had been transacted. *See Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 235 (2d Cir. 1998) (noting that to avoid liability under the false-name exception, "a creditor need not use its full business name or its name of incorporation . . ., it should use the name under which it usually transacts business, or a commonly-used

---

[6] Again, Politano's affidavit was offered to explain how Chicago Cable came to use the brand names "AT&T Cable Services" and "AT&T Broadband," but we are bound to disregard this information as decided above in Section A. 3.

acronym, or any name that it has used for the inception of the credit relation.") (internal citations and quotations omitted).[7] Because Chicago Cable's consistent use of the name "AT&T Cable Services" on the bills received by Rydel could not have indicated that a third party was attempting to collect his debts, Chicago Cable does not fall under prong three of the § 1692a(6) exception and was not a "debt collector" subject to liability under § 1692e.

Rydel argues vigorously that because Chicago Cable failed to register "AT&T Cable Services" or "AT&T Broadband" as assumed names as required by Illinois law and failed to register "AT&T Broadband" as a service mark until after this litigation was initiated, it was using those names illegally. Because the names were illegal, Rydel claims that Chicago Cable's use of those names in its debt collection contacts with him was a per se violation of § 1692e. Rydel further argues that a rule allowing an illegal name to be used in debt collection, even if the name has been used by the creditor since the inception of its relationship with the debtor, creates a bad result, when, as here, because of the illegal name, the debtor then has trouble identifying his true creditor.

Without passing on whether Chicago Cable's use of such names was actually illegal, we cannot accept either argument here (although Rydel's latter argument attracts some sympathy, especially when a corporation's structure is as labyrinthine as AT&T Corp.'s). This is because the FDCPA's focus is not on whether the name used by the creditor is permitted by law, but on whether the name used results in the debtor's deception in terms of what entity is trying to

---

[7] Plaintiff Gutierrez expressed it best in her deposition. When asked if she ever saw Chicago Cable referenced in the collection letters she received from CPA, she responded: "No, not that I recall because then I would have been like: Who are these people?"

collect his debt. Again, for a creditor to be liable under § 1692e, its use of a name other than its own must "indicate that a third person is collecting or attempting to collect" the consumer's debt. 15 U.S.C. § 1692a(6). In this case Chicago Cable consistently represented itself as "AT&T Cable Services" throughout its dealings with Rydel; no deception as to what entity was trying to collect his debt occurred. Thus, summary judgment was properly granted on Rydel's § 1692e claim.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of AT&T Broadband, LLC and Communications and Cable of Chicago, Inc.

DIANE P. WOOD, *Circuit Judge*, dissenting.  While it is entirely possible that Francis Gutierrez and Joseph Rydel may ultimately lose in their effort to prove that the defendants committed violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* (FDCPA), in my opinion there are disputed issues of material fact that render summary judgment in favor of the defendants inappropriate at this time. This is true even taking the record as my colleagues do. Unlike them, however, I would find that the district court abused its discretion in refusing to permit the plaintiffs to conduct further discovery when AT&T pulled key affidavits out of its hat at the last minute. Indeed, throughout the pretrial proceedings, AT&T's approach to the case was deplorable. It played a shell game with its various corporate affiliates, forcing the plaintiffs to guess

which entity was doing what at each moment. To this day, I am not sure myself. This record contains no answers to important questions such as what type of entity Communications and Cable of Chicago, Inc. (CCC) is; how is it related to the other AT&T corporate entities at issue here; and where did it derive its authority to use the AT&T name and logo, in combination with the word "Broadband." Moreover, AT&T's conduct during discovery bordered on the sanctionable, and at the very least, should not have been allowed to stand uncorrected. I would remand this case for further proceedings.

The reason why Rydel named AT&T Broadband, LLC as the defendant in his state court action was straightforward: this was the company named on his bills, and this was the address the entity that he thought his creditor used. It is preposterous, particularly for purposes of a remedial statute like the FDCPA, to think that an ordinary consumer would distinguish between a company named "AT&T Broadband" and a company named "AT&T Broadband, LLC." Rydel learned, through AT&T's motion to dismiss his complaint, that an entirely different company had been providing his services all along: CCC. At that point, both he and Gutierrez brought this action in federal court, seeking redress for the deception that had been practiced upon them. It is no small detail that CCC and LaSalle Communications (LaSalle, which apparently was Gutierrez's "real" provider) had never sought permission from the Secretary of State of Illinois to use an assumed name. Had they done so, a conscientious lawyer bringing a lawsuit would have discovered this essential fact and would have been able to name the correct party right away.

My colleagues take a "no harm, no foul" approach to the problem of the mis-named service provider, but the FDCPA does not. In addition to the harm to consumers like Gutierrez and Rydel that they acknowledge—the assumption that their creditor is the megalith AT&T, rather than

a local firm with presumptively less clout in the market—there are other harms they suffered. Errors and misunderstandings occur all the time in cable television bills (and in most other bills as well). A consumer stands no chance of ironing out those problems before they become severe if she does not know to whom she must speak. If, as it appears on this record, CCC and LaSalle are nothing more than storefronts for AT&T, the problem is even worse. The plaintiffs have now been told they must sue entities that are empty vessels for the provision of AT&T's cable services. Had they known this at the outset, they may have chosen a different method for receiving television services. Satellite TV is one alternative option for consumers, and an old-fashioned antenna for better "free" television reception is another, even if one assumes that cable providers have contractual exclusivity for cable service to defined areas during the term of their contracts.

The majority concedes that this record is murky at best with respect to the relationships among the various corporate entities. See *ante* at 20-21. In my opinion, we cannot decide this case without resolving that issue of fact. The district court was of the same opinion: it listed as an "uncontested" fact the proposition that CCC provided cable service by using the "AT&T" trademark in connection with the word "Broadband," citing only the affidavit of Frank Politano for support. Without Politano's affidavit, which my colleagues have properly refused to take into account, this crucial assumption collapses. Jennifer Heller also testified to matters that were in contest: she stated that the corporate owner of CCC and LaSalle, South Chicago Cable, Inc., "provided cable services branded as 'AT&T' in combination with the terms 'Broadband' or 'Cable Services' in the Chicago, Illinois area." The plaintiffs take issue with that fact. It is a critical dispute, since it goes to the question whether the use of the name "AT&T Broadband" was authorized, whether it was a trademark or a company name, and

whether anyone could be misled by the usage. Finally, Martha Ryczek's affidavit included information that contradicted the testimony of Richard Baucom, yet plaintiffs never had a chance to explore these inconsistencies. Ryczek provided the indispensable support for the proposition that it was CCC and LaSalle that handled Rydel's and Gutierrez's accounts, respectively, not AT&T Broadband, as Baucom had indicated.

My colleagues appear to think that the fact that AT&T was consistent in its misleading practices somehow helps its case, but I see nothing in the FDCPA that provides an excuse for a company that misleads everyone all the time. They note that it is hard to say whether Chicago Cable's use of the various AT&T names was actually illegal, *ante* at 22 (implying that it well might be), and in that connection they concede that Rydel's position was difficult at best. With the latter proposition, I agree wholeheartedly.

I would hold that the plaintiffs presented enough evidence to create a genuine issue of material fact regarding the question whether AT&T Broadband, LLC violated § 1692j of the FDCPA by furnishing forms to CCC and LaSalle that created the false belief in consumers that AT&T Broadband was collecting its debts. I would also hold that they presented enough evidence to create a genuine issue of material fact regarding the question whether CCC and LaSalle were using a false name and thus was not entitled to the protection of 15 U.S.C. § 1692(a)(6). CCC and LaSalle were certainly using a name other than their own to collect debts, and it is hard to see why that is not the same thing as a "false" name. There is no competent evidence in the record to show whether they were authorized to do so or not. Perhaps this means that all companies can now use a "trademark" name for purposes of debt collection, thereby concealing from consumers the identity of their true creditors, but I do not see how such a rule can be reconciled with the FDCPA.

Finally, I would hold that the district court abused its discretion in two ways in the discovery process. First, defen-

dants should have been sanctioned for designating Baucom as the person to be deposed, pursuant to Fed. R. Civ. P. 30(b)(6). The district court, and my colleagues, wrongly put the blame for Baucom on plaintiffs' shoulders. The rule expressly states that "the organization so named [in the notice of deposition and subpoena] shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify." *Id.* This means that it was AT&T's job to produce the right person in the first instance. AT&T was wrong if it thought that discovery may properly be conducted by first producing an uninformed higher manager, and waiting for a motion for sanctions, and a hearing on the motion, and then later finding another person, to be followed by more objections and hearings, and so on. That thinking is what has brought the American discovery system into international disrepute. It was bad enough for AT&T to do this, but when it then sprang the additional affidavits of Heller, Politano, and Ryczek on the plaintiffs, matters got even worse. Plaintiffs were entirely blind-sided by this maneuver. No responsible lawyer would dream of filing notices of depositions of every single individual in a company who is mentioned in the principal deposition that is being taken, nor should this court implicitly endorse this kind of scorch-the-earth tactic. Thus, the district court's second error was to refuse to give the plaintiffs the time they requested to follow up on these new people when their affidavits surfaced and it became clear that they were really the key corporate witnesses. Its failure to do so prevented the plaintiffs from developing the kind of record that was needed on summary judgment, allowed contested facts to remain in the record, and distorted the ultimate decision.

For these reasons, I would reverse the grant of summary judgment and remand for further proceedings. I respectfully dissent.

A true Copy:

    Teste:

                 _____
                 *Clerk of the United States Court of
                 Appeals for the Seventh Circuit*