Jay E. LABOUVE, Plaintiff,

v.

THE BOEING COMPANY, Defendant.

No. 02 C 8873.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 30, 2005.

Supplemental Opinion and
Order Sept. 14, 2005.

Scott Carlton Sands, Sands & Associates, Robert T. Newman, Maciorowski,

Sackmann & Ulrich, Chicago, IL, for Plaintiff.

Charles Jellinek, Rodney Perry, Bryan Cave LLP, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Jay LaBouve ("LaBouve") has sued The Boeing Company ("Boeing"), charging that Boeing violated the Americans with Disabilities Act ("ADA," 42 U.S.C. §§ 12111–12117[1]) and the Rehabilitation Act of 1973 ("Rehabilitation Act," 29 U.S.C. §§ 793, 794(a)) when it terminated his employment. Boeing has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Boeing's motion is granted and this action is dismissed.

### Summary Judgment Standards

Familiar Rule 56 principles impose on movant Boeing the burden of establishing a lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (*Lesch v. Crown Cork & Seal Co.,* 282 F.3d 467, 471 (7th Cir.2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (*Pugh v. City of Attica,* 259 F.3d 619, 625 (7th Cir.2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (*id.*). Ultimately summary judgment is appropriate only if a reasonable jury could not return a verdict for the nonmovant (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

This District Court has implemented Rule 56 through its LR 56.1, which requires both sides to submit factual statements supported by record evidence. In particular, LR 56.1(b)(3) requires any nonmovant (such as LaBouve) who seeks to avoid summary judgment to file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." In addition the nonmovant is required to submit a "statement, consisting of short numbered paragraphs, of any additional facts [not set forth in the movant's papers] that require the denial of summary judgment . . ." (*id.*).

LaBouve and his counsel have failed to comply with LR 56.1. They did not file the required response to Boeing's LR 56.1(a)(3) statement, nor did they file a statement of additional facts. Instead they merely provided what was characterized as a "summary of facts and circumstances," with some attached exhibits in the memorandum of law opposing Boeing's Rule 56 motion. Most of the "evidence" included in that memorandum comprises inadmissible hearsay, unsupported assertions or citations to evidence that is not properly in the record.

As such, LaBouve's response to Boeing's 56.1(a) statement is wholly inadequate: It does not comport with the express language of LR 56.1(b)(3) or with its intended purpose. LR 56.1's enforcement provision states that "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." And our Court of Appeals has

1. All further references to Title 42 provisions will simply take the form "Section".

"consistently held that failure to respond by the nonmovant as mandated by the local rules results in an admission" (*Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir.2003)).

■■■■ While this Court would thus be well justified in treating all facts in Boeing's LR 56.1(a)(3) statement as admitted and in refusing to consider any of the "facts" submitted by LaBouve in his memorandum of law (*Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809–10 (7th Cir. 2005)), such an evidentiary death sentence is unnecessary. Even when LaBouve's claims are considered in light of all admissible evidence tendered by LaBouve,[2] LaBouve has not submitted facts sufficient to survive Boeing's motion.[3]

### Factual Background [4]

In the late 1970s and early 1980s, the Royal Saudi Air Force ("Air Force") sought to purchase F–15 Eagle fighter aircraft and maintenance services for those aircraft (B.St.¶¶ 1, 3). Because the F–15 aircraft are military aircraft and because the Kingdom of Saudi Arabia ("Kingdom") is a foreign government, United States law required that the Kingdom negotiate and contract first with our government. Once there was government approval for the Kingdom contracts, the United States Department of Defense ("Department") contracted with McDonnell Douglas Corporation ("McDonnell") for the procurement of the fighter aircraft and with McDonnell Douglas Services ("McDonnell Services"), a wholly owned subsidiary of McDonnell, for aircraft maintenance (*id.* ¶¶ 2, 4). These contracts were called the "Peace Sun Program" contracts (*id.* ¶ 5).

As part of its contract to provide aircraft maintenance to the Kingdom and Air Force, McDonnell Services was required to subcontract out a significant portion (65%) of the maintenance work to Alsalam Aircraft Company ("Alsalam")(*id.* ¶¶ 10–12). Alsalam is a Saudi Arabian limited liability company established in 1982 as part of the Economic Offset Program of the Kingdom's Ministry of Defense and Aviation (*id.* ¶ 61–62). Specifically, Alsalam was created to help the Kingdom become self-sufficient in the aerospace industry (*id.* ¶ 63). Under the Alsalam–McDonnell Services subcontract, McDonnell Services was to provide certain services to Alsalam, including recruiting, mobilization-demobilization (e.g., clearances, travel, passports, etc.) and medical care (*id.* ¶ 14). Alsalam, however, had its own human resource department and retained complete authority over all other human resource and personnel matters, including the hiring and firing

---

**2.** "Considered" does not of course equate to the acceptance of all matters that LaBouve has proffered. Rather the Court will consider only the admissible evidence, albeit minimal, that LaBouve has presented properly. For example, his memorandum often cites to depositions, no portion of which has been tendered with LaBouve's memorandum. Because such assertions of claimed fact do not contain "appropriate specific references to the record," they will not be considered (see *Brasic v. Heinemann's Inc. Bakeries*, 121 F.3d 281, 286 (7th Cir.1997)).

**3.** In the summary judgment context, of course, LaBouve's burden is only that of creating reasonable inferences, not one of proof as such (see, e.g., *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994)).

**4.** This factual recital is culled from the parties' submissions. This opinion cites to Boeing's LR 56.1(a)(3) statement as "B. St.", to Boeing's Memorandum of Law as "B. Mem.—" and to Boeing's Reply Memorandum as "B. R. Mem.—". LaBouve's responsive memorandum will be cited as "L. Mem." and its attached exhibits will be cited as "L. Ex.—".

of employees (*id.* ¶¶ 15–17, 88–92).[5]

Boeing is a corporation organized under the laws of Delaware (*id.* ¶ 58). It was never a direct party to the Peace Sun Program contracts, although on August 1, 1997 Boeing acquired McDonnell (*id.* ¶¶ 7, 9). In addition, at the beginning of 2001, when the events at issue in this case occurred, Boeing, through its intermediary companies and limited liability partnerships, owned approximately 25% of the interest in Alsalam (*id.* ¶ 75).

LaBouve was hired by McDonnell Services in July 1995 as a Technician Airplane General to provide maintenance service on F–15 aircraft in the Kingdom (*id.* ¶¶ 21–22). In 1997, after being directed by the Kingdom and Air Force to shift more maintenance work to Alsalam, McDonnell Services told LaBouve and a number of other McDonnell Services employees that they would be laid off in January 1998 (*id.* ¶¶ 25–28). LaBouve and the other employees who were to be laid off were given the option of working for Alsalam in essentially the same capacity and on the same terms as they had been under their McDonnell Services contracts (*id.* ¶ 29–30). LaBouve elected to stay in the Kingdom and work for Alsalam (*id.* ¶ 31). On January 12, 1998 LaBouve signed an employment contract with Alsalam (*id.* ¶ 33; L. Ex. F).

Two and one-half years later, in July 2000, LaBouve sustained a work-related injury to his neck and back while working in the engine shop at Alsalam (*id.* ¶ 34). Initially he was treated in the Kingdom, but he was dissatisfied with the quality of care that he was receiving (*id.* ¶¶ 35, 37). LaBouve therefore returned to the United States in October 2000 for medical care and, after receiving additional physical therapy, had surgery on January 8, 2001 (*id.* ¶¶ 38–39). Due to his injury LaBouve was absent from work from October 2000 through January 2001 (*id.* ¶ 41).

 Air Force became dissatisfied with LaBouve because of his absence from work, and in January 2001 it requested that LaBouve be terminated from his position under the Peace Sun Program contracts (B. St. ¶ 42; L. Mem. 5–6; L. Ex. H). Air Force sent a letter to that effect to Department at Warner Robbins Air Force Base, and Department then forwarded Air Force's letter to McDonnell Services (B.St.¶ 43). Upon receipt of the letter McDonnell Services notified Alsalam of Air Force's request that LaBouve be terminated (*id.* ¶ 44). Abdullah Al-Akbary, Alsalam's Human Resources Supervisor, notified LaBouve that effective March 27, 2001 he was terminated from the Peace Sun Program contracts and would not return to the Kingdom for further employment with Alsalam.[6]

**5.** LaBouve contests this assertion in his memorandum, positing that Boeing employees were involved in the process of deciding whether LaBouve would be terminated and, if so, who would notify LaBouve of his termination. All but one of the citations for those assertions are to non-record purported sources. Moreover, the single piece of record evidence cited—a series of email exchanges that Boeing contests as hearsay—point to the opposite of what LaBouve seeks to argue. While the emails indicate McDonnell Services' and Boeing's involvement in notifying and helping to process LaBouve's termination, a fact that Boeing does not contest, two of the emails from McDonnell Services or Boeing employees state explicitly that "Alsalam has ultimate responsibility for making the decision on when/if their employees return" (L.Ex. I).

**6.** While LaBouve argues in his Memorandum that he learned of his discharge from Don Kirkpatrick, an employee in McDonnell Services' human resource department, no record citation is provided for that assertion. Because evidence relied upon for summary judgment "must be competent evidence of a type otherwise admissible at trial," this Court disregards LaBouve's factual contention (*Bom-*

On August 8, 2001 LaBouve filled out an intake questionnaire with the federal Equal Employment Opportunity Commission ("EEOC")(*id.* ¶ 55; L. Ex. M). Six months later, on February 20, 2002, LaBouve filed a formal Charge of Discrimination with EEOC (L.Ex. M). On September 11, 2002 EEOC issued LaBouve a right-to-sue letter.

### ADA Claims

LaBouve makes two ADA-based claims. First, he raises a claim for disparate treatment, asserting that Boeing terminated him because of his disability. Second, he asserts that Boeing discriminated against him by failing to make reasonable accommodation of his disability. Because LaBouve has not demonstrated a genuine issue of material fact in support of the proposition that Boeing was LaBouve's employer, Boeing is entitled to summary judgment on those ADA claims.

As a threshold matter, the ADA applies only to "covered entities." Under Section 12111 a "covered entity" includes "an employer, employment agency, labor organization or joint labor—management committee." Additionally the ADA applies to employment actions taken outside of the United States by foreign corporations only when the foreign employer is "controlled" by an American employer (Section 12112(c)(2)).

Because both the earlier and later discussion show that the decisionmaking authority was unquestionably lodged in and exercised by Alsalam, LaBouve's notion of Boeing's direct liability is demonstrably empty. Hence this opinion will focus primarily on the concept of vicarious responsibility—whether Alsalam's actions can be placed on Boeing's corporate doorstep.

In that respect some confusion is reflected by the parties' submissions as to the appropriate test for determining whether Boeing can thus be held liable for the allegedly discriminatory acts of Alsalam. Section 12112(c)(2)(C) prescribes a four-factor test for determining when a domestic parent corporation "controls" a foreign affiliate: (1) the interrelation of operations, (2) the common management, (3) the centralized control of labor relations and (4) the common ownership or financial control. By contrast, *Papa v. Katy Indus., Inc.*, 166 F.3d 937 (7th Cir. 1999) set out a separate test to use when evaluating whether a domestic corporation should be held liable for discriminatory acts of its *domestic* affiliate.

Before *Papa* courts applied a four-factor test identical to that in Section 12112(c)(2)(C) in employment discrimination cases to determine whether two domestic corporations could be considered to be a "single employer" or "integrated enterprise," such that liability could be imposed even where one corporation did not directly employ the complaining party. *Papa* abrogated the "single employer" test, finding it to be too "vague" to be applied consistently (166 F.3d at 942). Instead *Papa* offered three situations in which a parent could be held liable for the acts of its affiliates: (1) where the circumstances were present for piercing the corporate veil, (2) where the corporation was splintered into affiliates in an effort to avoid liability under the anti-discrimination laws or (3) where the parent directed the discriminatory act or policy at issue (*id.* at 941). While *Papa* specifically addressed

---

bard v. Ft. Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996)). But in light of what has been said in n.5 and the accompanying text as to the power of decision being vested

in Alsalam, any claimed McDonnell involvement in conveying that decision would make no difference anyway.

the application of the "tiny" employer exception for employer liability under Title VII (*id.* at 940), it stated that its principles of affiliate liability would apply broadly unless, as is true under Section 12112(c)(2)(C), a "statute, or the particular policy that animates that statute, ordains a particular test" (*id.*at 941). Since *Papa* it has been unclear what precedential value the "single employer" line of cases may have for cases that fall outside of *Papa*'s specific reach.

LaBouve seeks to hold Boeing liable under two theories. First, he urges that Boeing is vicariously directly liable on a direct-line basis for the assertedly discriminatory acts of Alsalam. Second, LaBouve advances a two-step approach, arguing that McDonnell Services is responsible for Alsalam's actions and Boeing is responsible for McDonnell Services's actions.

■■ As to LaBouve's first theory, because Alsalam is a foreign corporation and because its actions took place in the Kingdom, Section 12112(c)(2)(C) and its attendant four-factor analysis applies. Section 12112(c)(2)(C) provides no guidance on the comparative weight of the four factors, and there is no published caselaw on Section 12112(c)(2)(C) offering such instruction. Notably, however, both *Papa* and the "single employer" line of cases focus on the labor relations between the two corporate entities and, in particular, on which entity caused the discriminatory act in question.[7] Because *Papa*, the "single employer" cases and Section 12112(c)(2)(C) all address the liability of a parent or affiliate for acts of its subsidiary or other affiliate, it seems equally appropriate to look at labor relations in an analysis under Section 12112(c)(2)(C).

As for control over labor relations generally, there is no evidence to suggest that Boeing has a direct role in the labor relations and operations of Alsalam. Instead it is undisputed that Alsalam has its own human resources department and that Alsalam creates its own personnel policies and practices, many of which address the labor requirements of the Kingdom (B.St. ¶¶ 88, 90).

Additionally, there is no evidence to suggest that Boeing directed Alsalam to fire LaBouve. It is uncontroverted that the initial decision to terminate LaBouve from the Peace Sun Program contracts originated with Air Force, the client (B. St. ¶ 42; L. Mem. 5–6; L. Ex. H). Air Force was dissatisfied with LaBouve because of his absence from work from October 2000 to January 2001 (*id.*). Although McDonnell Services helped communicate Air Force's request to Alsalam, there is no evidence that Boeing (or McDonnell Services) employees were involved in the decision to terminate LaBouve.

Brief examination of the other three factors—interrelation of operations, common management and common ownership/financial control—further reveals that Boeing cannot be considered LaBouve's employer. Indeed, the last of those factors is alone fatal to LaBouve's claim. Through its partial ownership of Boeing Industrial Technology Group ("Boeing Technology") at the beginning of 2001 (when the events in dispute occurred), Boeing had a 25% equity interest in Alsalam (*id.* ¶ 75). Nothing in the record supports the notion that its minority ownership calls for attri-

---

7. Additionally, while the opinion was not published, the analysis of Section 12112(c)(2)(C) in *Duncan v. Am. Int'l Group, Inc.*, No. 01–CV–9264, 2002 WL 31873465 (S.D.N.Y. Dec. 23), follows the same approach. *Duncan, id.* at *3 stated that "the critical question to be answered is: 'What entity made the final decisions regarding employment matters relating to the person claiming discrimination?'"

bution of the acts of such an affiliated (not a subsidiary) corporation to Boeing. Any such approach would do violence to basic principles of corporate integrity—absent, of course, any showing of alter ego or piercing the corporate veil, of which (as discussed later) the record contains not a whisper.

And that conclusion is further buttressed by a look at the two remaining factors. As for interrelation of operations, Boeing offered uncontroverted evidence that no Boeing employees are involved in the day-to-day operations of Alsalam (B.St. ¶ 86). Alsalam is a separate and distinct legal entity from Boeing, observing all of the requirements of a Kingdom limited liability company (*id.* ¶ 66). In addition, Boeing provided undisputed evidence that Alsalam is managed separately from Boeing. Neither Alsalam's President/CEO nor its Chairman, both Saudi Arabian citizens, is a Boeing employee (*id.* ¶ 85). Alsalam's General Manager, elected by Alsalam's Board, is also a Saudi citizen and not a Boeing employee (*id.* ¶ 96). Lastly as to common management, Boeing Technology—partly owned by Boeing—is a 50% equity owner of Alsalam that has the power to appoint four of the twelve directors of Alsalam's Board (*id.* ¶ 97). Again that points well away from, rather than toward, control by Boeing itself.

In sum, to hold Boeing liable as LaBouve's employer based on those factors, attenuated as they are here, would essentially require companies to erect an impenetrable barricade between affiliates to assure limited liability (see, e.g., *Papa*, 166 F.3d at 943). Section 12112 does not require as much.

Finally, LaBouve's two-step approach contends that Boeing should be liable for Alsalam's conduct because Boeing is liable for McDonnell Services' actions and McDonnell Services is liable for Alsalam's actions. Under that theory LaBouve must first show that McDonnell Services "controlled" Alsalam pursuant to Section 12112(c)(2)(C) and must then demonstrate that Boeing should be held liable for the acts of McDonnell Services under *Papa*. But LaBouve does not present enough to demonstrate a genuine issue of material fact as to either of those steps.

■ As already said, Alsalam has its own human resource department and creates its own personnel policies separate from McDonnell Services. In addition, while it is uncontroverted that under the subcontract with Alsalam it was McDonnell Services that provided recruiting, mobilization-demobilization and medical care for Alsalam, those things are separate from what is at issue here—Alsalam's making of its own decisions as to the discipline and discharge of its employees (B.St. ¶¶ 13–14, 90, 92).

As to the entity responsible for LaBouve's termination, LaBouve argues that McDonnell Services directed Alsalam to fire him because of his disability. True enough, McDonnell Services was involved in relaying Air Force's decision to Alsalam—but that communication was only "ministerial" (B.R. Mem.10), simply relaying the result of the independent decisionmaker's election.

Moreover, B. Mem. 9–10 highlights that McDonnell Services was involved only in communicating to Alsalam Air Force's request that LaBouve be removed from the Peace Sun Programs. No record evidence even suggests that McDonnell Services was involved in the decision to terminate LaBouve as an Alsalam employee.

LaBouve seeks to contradict Boeing's position by introducing a number of email exchanges both in the body of his memorandum and as exhibits that LaBouve argues show McDonnell Services's partic-

ipation in the decision to terminate his employment. Much of that evidence does not warrant consideration under LR 56.1[8] And, quite apart from that problem, those e-mails speak only to McDonnell Services's role as an administrative pass-through. That McDonnell Services played such a role is unsurprising. Because of the nature of the contracts, Alsalam did not have a direct relationship with either Air Force or Department. Air Force contracted directly only with Department, which in turn then subcontracted the maintenance work to McDonnell Services, which later subcontracted that work to Alsalam.

Evaluating the other three factors also confirms that McDonnell Services did not "control" Alsalam. Apart from the purely administrative services provided under the subcontract, no evidence suggests that McDonnell Services's and Alsalam's operations were entwined. And once again the only suggestion that Alsalam and McDonnell Services had common management comes from LaBouve's unsupported assertions that both are run by Boeing.

So LaBouve has failed at the first step of showing a material factual issue as to McDonnell Services "controlling" Alsalam under the Section 12112(c)(2)(C) test. But even were that not the case, no record evidence calls for a second-step finding that it would be appropriate to hold Boeing liable for McDonnell Services' actions. Under *Papa*, 166 F.3d at 940 Boeing can be liable where the circumstances call for piercing the corporate veil, as where the affiliate was created solely to avoid anti-discrimination liability or where the parent corporation directed the discriminatory act. No such circumstances are present in this case.

To pierce the corporate veil LaBouve must show (1) a unity of interest and ownership between Boeing and McDonnell Services such that the two entities no longer have separate corporate personalities and (2) "circumstances...such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice" (*Worth v. Tyer*, 276 F.3d 249, 260 (7th Cir.2001)). There is no hint that McDonnell Services ignored corporate formalities or that adhering to the separateness of Boeing and McDonnell Services would work an injustice on LaBouve.

Rather Boeing presented uncontroverted evidence that McDonnell Services remained a separate and distinct legal entity after Boeing's acquisition of McDonnell Services (B.St.¶ 6).

Nor does any evidence support the notion that McDonnell Services was created to avoid the anti-discrimination laws. Indeed, McDonnell Services' corporate existence began before Boeing's acquisition of McDonnell Services and continued thereafter. Finally, this opinion has already considered and dismissed the possibility, given the facts presented, that either Boeing or McDonnell Services directed Alsalam to terminate LaBouve.

In short, LaBouve has failed in every respect to demonstrate a genuine issue of material fact as to whether Boeing should be considered his employer for purposes of the ADA. Hence LaBouve's ADA claims fail.

---

**8.** For example, LaBouve describes a series of e-mail exchanges at L. Mem. 6–8, but he provides no citation for any of the e-mails that he refers to and quotes. As *Smith*, 321 F.3d at 683 (citations and internal quotation marks omitted) has put it, "a mere disagreement with the movant's asserted facts is inadequate of made without reference to specific supporting material. In short, [j]udges are not like pigs, hunting for truffles buried in briefs."

## Rehabilitation Act

As stated at the outset of this opinion, LaBouve also raises two claims under the Rehabilitation Act. In that regard he charges that Boeing has violated Rehabilitation Act § 793 by failing to apply affirmative action policies to LaBouve. In addition LaBouve claims that Boeing violated Rehabilitation Act § 794 when it refused to accommodate his disability. Boeing seeks summary judgment on both claims.

█ As to the first of those contentions, Boeing correctly responds that there is no private right of action under § 793 (*D'Amato v. Wis. Gas Co.*, 760 F.2d 1474, 1478 (7th Cir.1985)). LaBouve attempts an end run around that "well-settled rule" (*id.*) by arguing that LaBouve is a third party beneficiary to the contract between Boeing/McDonnell Services[9] and the United States government pursuant to that contract's § 52–222–36 (L.Ex. H). As dubious as that assertion may be, *D'Amato*, (*id.* at 1484) teaches that "Congress intended that the administrative scheme be the sole avenue of redress for the handicapped" under Rehabilitation Act § 793. LaBouve's § 793 claim fails on that ground.

█ To prevail on his claim under Rehabilitation Act § 794(a), LaBouve must set out four elements: "(1) that [he] is a 'handicapped individual' under the Act, (2) that [he] is 'otherwise qualified' for the [benefit] sought, (3) that [he] was [discriminated against] solely by reason of [his] handicap, and (4) that the program or activity in question receives federal financial assistance" (*Grzan v. Charter Hosp. of N.W. Ind.*, 104 F.3d 116, 119 (7th Cir. 1997)). Boeing is entitled to summary judgment on that claim because LaBouve

has failed to offer any evidence that LaBouve was working on a program "receiv[ing] federal financial assistance."

"Federal financial assistance" is not defined in the Rehabilitation Act itself. Federal regulations issued by the Department of Health, Education and Welfare ("HEW"), the agency charged with establishing regulations to implement that statute define "Federal financial assistance" as (45 C.F.R. § 84.3(h)(1983)):

> any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the Department provides or otherwise makes available assistance in the form of:
>
> (1) Funds;
>
> (2) Services of Federal personnel; or
>
> (3) Real and personal property or any interest in or use of such property....

Under HEW's regulations a party receives "federal financial assistance" only when it benefits in its dealings with the government to a greater extent than it would if it were dealing with another party (see *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir.1990)).

No evidence suggests that Boeing or McDonnell Services received "federal financial assistance" as required under the Rehabilitation Act. L. Mem. 14 argues that LeBouve "was working on a federally funded program," but he offers no evidence to support that assertion. And Boeing's submissions indicates otherwise— that the Peace Sun Program contracts were merely procurement contracts not covered under the statute. Hence LaBouve's final claim succumbs as well.

---

**9.** There is a dispute between the parties as to whether Boeing became a party to the Peace Sun Program contracts following its acquisition of McDonnell Services. That issue need not be resolved, for LaBouve's Rehabilitation Act claims fail regardless of whether Boeing is the real party to the contract.

## Conclusion

LaBouve has failed to demonstrate a genuine issue of material fact as to whether Boeing should be considered his employer, a threshold requirement necessary for LaBouve to pursue his ADA claims against Boeing. Nor has LaBouve established a genuine issue as to whether Boeing received "federal financial assistance," as is required for recovery under the Rehabilitation Act. In sum, Boeing is entitled to a judgment as a matter of law. Its motion for summary judgment is granted, and this action is dismissed with prejudice.

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

Losing plaintiff Jay LaBouve ("LaBouve") has filed a "Motion or Petition for Relief from Judgement [sic]," seeking to have this Court revisit its 20–page August 20, 2005 memorandum opinion and order ("Opinion") that granted summary judgment in favor of The Boeing Company ("Boeing") in LaBouve's federal employment discrimination lawsuit. Because that new filing also displays the same basic flaws that spelled doom for LaBouve to begin with, this supplement to the Opinion can dispatch LaBouve's motion in comparatively short order.

■■■■ Before that is done, however, two general propositions should be stated at the outset, in light of the fact that this Court has already considered and rejected the matters adduced in LaBouve's most recent filing. One is set out in the felicitous statement by the late Judge Dortch

Warriner as to why such motions for reconsideration ordinarily should not—and do not—form the basis for a judicial about-face (*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va. 1983)):

> The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

And the other is this Court's more abbreviated, but equally accurate, comment along the same lines in *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988)(as adapted to this case), which has been cited and quoted by other courts around the country:

> Despite what [LaBouve] appears to think, this Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure. Motions such as this reflect a fundamental misunderstanding of the limited appropriateness of motions for reconsideration.

But in this instance those general principles simply buttress the case-specific and fatal defect displayed in LaBouve's renewed effort.[1] Throughout this new filing,

---

1. What follows in the text is quite apart from the blithe failure of LaBouve's counsel to say even a word about his original failure to have complied with this District Court's LR 56.1, which has been expressly designed to implement Fed.R.Civ.P. 56 by identifying the existence or nonexistence of genuine issues of material (that is, outcome-determinative) facts

(see Opinion at 2–3). Less than a week after the Opinion was issued, our Court of Appeals once again reconfirmed the necessity of a litigant's compliance with LR 56.1 in *FTC v. Bay Area Bus. Council, Inc.*, No. 04–2173, 2005 WL 2036251, at *4–*5 (7th Cir. Aug. 25), stating as part of that extended discussion (citations omitted):

just as in their original submission, LaBouve's counsel persist in ignoring the basic fact that it is Boeing and *only* Boeing that has been sued here. Although the current submission correctly acknowledges, both early (Motion at 2) and late (Motion at 4), that McDonnell Douglas Services, Inc. ("McDonnell Services") is a corporate subsidiary of Boeing, LaBouve's entire filing persists in an impermissible effort to obliterate, not merely to blur, the separate corporate existence of that subsidiary and the significance of that independent existence. Even apart from the additional separate corporate existence of Alsalam Aircraft Company, LaBouve's actual employer (the company for which he chose to work when he was laid off by McDonnell Services in January 1998), nothing supports his counsel's effort to ascribe McDonnell Services' actions to its parent company Boeing (in that regard, see *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 940–42 (7th Cir.1999) and the discussion at Opinion 9–10).

Thus LaBouve's current motion recites a number of matters that relate to conduct of McDonnell Services, but the only thing that he can attribute to his actual target—Boeing—is an October 14, 1998 advertisement by Boeing in the *St. Louis Post Dispatch* for possible employment by McDonnell Services or Alsalam, as described in Motion at 1–2:

> The advertisement calls for applicants for McDonnell Douglas Services, Inc. and Al Salaam Aircraft Company; the latter was identified in the advertisement as a Saudi firm under contract to McDonnell Douglas, and the advertisement was seeking additional personnel

to provide training and technical support for the F15. The advertisement also said that candidates applying may be selected as MDS employees or Al Salaam employees. The advertising identified McDonnell Douglas Services, Inc. as a subsidiary to The Boeing Company.

Apparently LaBouve's counsel are unwilling to recognize that the cited advertisement reinforces, rather than diluting, the separate existence of both McDonnell Services and Alsalam and the fact that the advertised-for applicants (like LaBouve) would *not* be employed by Boeing itself.

In short, LaBouve's motion for relief is conceptually empty. It is denied.

Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.

This supplement's principal focus on just one of the fundamental flaws in LaBouve's position should not be mistaken as any retreat from that principle or any of the other matters that were dealt with extensively in the Opinion.